[No. S004569. Crim. No. 23362. Aug. 17, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
CONSTANTINO CARRERA, Defendant and Appellant.

COUNSEL

Stephen B. Bedrick and Doris Brin Walker for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jane N. Kirkland and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARGUELLES, J.*—Defendant Constantino Carrera was charged with the first degree murder (Pen. Code, § 187)[1] and robbery (§ 211) of Carol and Jack Hayes. Special circumstances of felony murder-robbery (§ 190.2, subd. (a)(17)(i)) and multiple murder (§ 190.2, subd. (a)(3)) were alleged. Defendant was convicted on the two counts of first degree murder and on the robbery count, and both special circumstances were found to be true. The jury fixed the penalty at death. This appeal is automatic. (§ 1239, subd. (b).) We affirm.

FACTS

On the morning of April 8, 1982, the bodies of Jack and Carol Hayes, the managers of the Imperial 400 Motel in Mojave, California, were discovered on the floor of their living quarters adjoining the motel office. They had been stabbed to death. Carol Hayes was fully dressed and had been stabbed 20 to 30 times. Jack Hayes was clad only in a T-shirt and undershorts; his body had 14 or 15 large stab wounds, including one to the head where a knife had broken off at the surface of the skull leaving a 3-inch portion embedded inside. Circumstantial evidence—including the testimony of one motel guest who had spoken to Jack Hayes between 9 and 9:30 p.m. the prior evening and testimony that Carol Hayes generally handled the motel office duties before but not after 10 p.m., while Jack took a nap—indicated that the couple was killed on April 7 sometime between 9 and 10 p.m. Judging from the motel records, approximately $238 was missing from the office receipts.

The attention of police investigators was soon drawn to defendant and Ramiro Ruiz Gonzales (Ruiz), who were arrested without a warrant on

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1] All further statutory references are to the Penal Code unless otherwise indicated.

April 12, 1982, the police fearing the two might flee after they saw their mutual friend and intimate, Teresa F. (Teresa), in the company of a detective. A complaint charging defendant with the murder and robbery of Jack and Carol Hayes, and with felony murder-robbery and multiple-murder special circumstances, was filed in municipal court two days later. That afternoon, certain of defendant's family members and friends were allowed to visit him at the county jail. His conversations with these visitors, in which he made several arguably incriminating statements, were secretly monitored and recorded. Defendant was arraigned the following morning.[2]

At defendant's trial, the prosecution endeavored to show that the robbery and murders were committed by defendant and Ruiz, painting defendant as the main actor or, alternatively, as at least an accomplice under theories of intentional murder and felony murder-robbery. The defense attempted to place responsibility for the crimes on Ruiz and Teresa, characterizing defendant as at most an accessory after the fact who had assisted the destruction of evidence to help his friends escape detection.[3]

GUILT PHASE EVIDENCE

The pivotal evidence at trial fell largely into five discrete categories: (1) testimony from defendant and others regarding who was present at or absent from a gathering between the critical hours of 9 and 10 p.m. on April 7, 1982; (2) testimony from Mike Santana (Santana) and Teresa, who, charged as accessories after the fact, testified under grants of immunity from prosecution regarding statements made by defendant; (3) testimony of two inmate witnesses, who had been incarcerated with defendant at the county jail, regarding his statements to them about the murders; (4) physical evidence, including bloody shoe prints at the motel and items of clothing that defendant and Ruiz had attempted to burn, tending to link defendant to the murders; and (5) defendant's jailhouse conversations with his visitors and letters to friends.

*Events of April 7, 1982.* By all accounts, defendant (20 years old at the time) spent the early afternoon of April 7 with Ruiz (age 17) and Santana (age 19), and possibly with his younger brother Efrain Carrera as well, drinking beer and smoking marijuana. Santana, Ruiz and defendant each

---

[2]Defendant and Ruiz were held to answer at the conclusion of a joint preliminary examination that rested on the testimony of six police officers and Teresa. An information substantially reiterating the charges of the complaint was later filed in superior court.

[3]Ruiz, aged 17 at the time of the crime, was tried first and was convicted on all counts. He was tried as an adult, but was not subject to the special circumstance allegations and was sentenced to two consecutive terms of twenty-five years to life, with the possibility of parole. The conviction was affirmed on appeal. (*People* v. *Gonzales* (1986) 186 Cal.App.3d 591 [230 Cal.Rptr. 732].)

took a small amount of LSD (acid) as well. Early that evening, they joined a group of friends at the house of Santana's older sister, Carmen Santana Valadez. Among the others present during the evening, in addition to Carmen, were Teresa (age 14), Tina and Sherry H. (12 and 14 years old, respectively), and Maria Carrera Nunez, defendant's older sister. Patience S. (age 15) was a latecomer, arriving shortly before defendant and Ruiz left the gathering with a few of the others.

With the exception of Ruiz, all of these testified to defendant's movements. Sherry H. saw defendant and Ruiz leave the party around 9 p.m. and return around 10. Her younger sister Tina testified similarly that defendant and Ruiz left the party around 8:30 or 9 and returned about 9 or 10. Patience S. testified that she and her boyfriend, on their way to Carmen's house, drove past defendant and Ruiz walking toward the house at 10 to 10:30. Teresa saw defendant and Ruiz leave the party between 9 and 10. She did not see their return, as she was inside the house at the time. Santana testified that defendant and Ruiz left the party at 9 or 9:30 and returned a half-hour later. Defendant's brother Efrain offered the first variation from this scenario, testifying that Ruiz left the party alone about 8:30 and that defendant left with Tina H. about 15 minutes later. Defendant and Tina allegedly returned to Carmen's house later that evening, and Ruiz came back later yet, still alone, about 10:30 or 11. Defendant's sister Maria and Santana's sister Carmen did not see anyone come or go that evening.

Defendant's story varied subtly from that of the other witnesses, not so much in the various events as in when those events took place. According to him, Teresa, and Tina and Sherry H., did not even arrive at Carmen's house until 9 p.m.—well after the arrival time each of them had estimated. He and Tina went to his sister Maria's house about 9:30 to "mess[ ] around a little while"—an episode not mentioned by Tina herself or any other witnesses, except for defendant's sister, who placed the event earlier in the afternoon, and his brother Efrain. Ruiz and Teresa allegedly left Carmen's house about 10 to go out to Ruiz's car and came back in the house 30 to 45 minutes later, at which time Teresa was crying hysterically. According to Santana, Teresa had remained in the house during this period, and Teresa testified that she had gone with Ruiz to his car much earlier in the evening. Defendant admitted leaving the house with Ruiz that evening, but testified that he did so only to help find a battery for Ruiz's car and only after Ruiz and Teresa had returned from their own absence, and that he and Ruiz met Patience S. and her boyfriend while on the way back from this errand.

The bulk of this testimony placed defendant and Ruiz away from the gathering during the time that Jack and Carol Hayes were probably killed.

The evidence similarly tended to place Teresa and Santana at the party throughout that period.

*Immunized Witness Testimony.* Teresa and Santana testified, as did defendant, and Tina and Sherry H., that the six of them left Carmen's house in Ruiz's car after getting a jump start from Patience S.'s boyfriend. Teresa and Santana both also testified that Ruiz stopped the car in a deserted area a little while later, that defendant, Ruiz and Santana got out, and that defendant and Ruiz changed their clothes. The two also said that, after dropping off Tina and Sherry H. at their home, Ruiz stopped the car at a liquor store.

Teresa testified that Santana and Ruiz went into the store, while she and defendant remained outside in the car. At this time, defendant told her what had happened that evening. Defendant first told her that he had "messed up his whole life" and that he "had stabbed someone." Defendant said he and Ruiz had gone to the Imperial 400 Motel to get some money that was owed Ruiz, who had formerly worked there. Ruiz stabbed the woman at the motel many times; defendant said that he cut her on the arm when he saw her reaching for something. Defendant also told her that the man came out "and they hit him with scissors in the head." Santana and Ruiz then came back to the car from the store, and the four drove to a motel. When Santana and Ruiz again left the car to rent rooms, defendant told Teresa that "a knife broke off in the lady's neck, in the throat." Two rooms were rented at this motel. Defendant and Santana spent the night in one of the rooms; Ruiz and Teresa shared the other.

Santana's testimony differed somewhat from Teresa's. According to Santana, defendant and Ruiz went into the liquor store while he remained in the car with Teresa. He agreed, however, that he and Ruiz rented the motel rooms while defendant and Teresa remained in the car. Santana testified that defendant told him about the events at the Imperial 400 Motel while they were in the room they shared. Defendant told Santana that he and Ruiz went to the motel to rob it and that Ruiz stabbed the lady a couple of times. Defendant said he cut her once on the wrist when she reached for the telephone and then froze while Ruiz continued to stab her. Ruiz then walked into a room where the man was sleeping and stabbed him. The man got up and hit Ruiz, but Ruiz continued to stab him until he fell down. Defendant also told Santana that while Ruiz was stabbing the people, "the knife broke and he went inside the kitchen and got a bigger knife." Santana further testified that he saw defendant and Ruiz divide more than $100 and that some of the money had specks of blood on it.

Despite the conflict over who went into the liquor store with Ruiz, the testimony of Teresa and Santana coincided on three main points. Defendant

and Ruiz planned to rob the Imperial 400 Motel, defendant cut Carol Hayes on the arm when she reached for something, and both victims were stabbed many times. Defendant's account of the events, according to both Teresa and Santana, consistently placed the greater portion of responsibility for the murders on Ruiz.

*Inmate Informant Testimony.* Julius Jones, a trustee inmate at the county jail while defendant was incarcerated there, testified during the prosecution's case-in-chief that defendant had often talked to him about the murders at the Imperial 400 Motel. At first, defendant denied being involved; later, defendant told Jones that he, Ruiz and Ruiz's girlfriend were involved. The girl had waited outside in the car while defendant and Ruiz went inside. They had only meant to rob the motel, but it ended up as a murder. Defendant said that the lady reached for the telephone and he "chopped her hand off, cut her hand off." The man had tried to help his wife and defend himself but Ruiz had him cornered, and defendant and Ruiz went on and killed him.

A further inmate witness, Thomas Hill (also known as Thomas Morse), testified in rebuttal for the prosecution. Hill said that defendant told him about the killings at the Imperial 400 Motel. Defendant had tried to get him to read some legal papers, but Hill had not done so and defendant had finally told him about the case. Defendant and "another guy" whose name "started with an R" had planned to rob the place. They left a party, but the other guy's car would not start and they got a ride to the place from another friend, "this guy, Mike Santana." They stabbed the woman and the man. "When they stabbed the man in the chest, the knife broke, and . . . [defendant] ran into the kitchen, got another knife and came back and stuck him in the head . . . ." Defendant denied having talked to Hill or offering him a copy of a transcript to read. Defendant testified that he had two transcripts and a police report in his cell and that Hill would often remain in the cell when defendant would go out in the yard. Hill denied having read any of the legal papers that defendant had in his cell.

Although the inmates' testimony varied in some respects, and that of Hill was perhaps questionable in light of his inability to recall Ruiz's name while remembering that of the minor character "this guy, Mike Santana" without difficulty, each inmate reported a number of details consistent with the testimony of other witnesses in the case. Each denied receiving or being offered any inducements for testifying.

*Physical Evidence.* What clothing the principal actors in these events were wearing, and in particular what shoes, played a large role in this case. Two separate types of shoe prints had been found in the blood on the floors at the

motel. One was a herringbone pattern determined to be typical of Cornet brand shoes. The other was a rectangular pattern matching Trax brand tennis shoes.

All witnesses, including defendant, put him in gray pants, probably corduroy and possibly Levi's, at the start of the evening. Tina H., Patience S. and others, including Teresa and Santana, testified that they saw a blood spot on defendant's pants when he and Ruiz were leaving Carmen's house at the end of the evening. According to Tina, Teresa and Santana, defendant changed into green or a different type of gray pants after the smaller group left Carmen's house. Defendant agreed that he had gotten out of the car with Ruiz and Santana during a short stop, but denied changing his clothes. Teresa, Santana and Patience put defendant in gray Trax brand tennis shoes originally, and Teresa and Santana had him changing into black dress shoes when he changed his pants. Defendant, and his brother and sister, testified that he was wearing his brother's blue Nike tennis shoes with orange stripes.

The various witnesses, with the exception of defendant, put Teresa in Bon Jour jeans and white Trax brand tennis shoes throughout the evening. Defendant testified that she changed into blue Levi's jeans and white or slightly darker tennis shoes with blue stripes after returning to Carmen's house with Ruiz. The witnesses put Ruiz in blue pants and tan tennis shoes at the start. Teresa and Santana testified that Ruiz changed from his tennis shoes into black slippers while the car was stopped.[4] Defendant agreed that Ruiz had changed his shoes, and he testified that he saw a pair of pants, presumably the jeans he said Teresa had been wearing earlier, and Teresa's tennis shoes in the trunk of the car.

Defendant admitted going into the desert with Ruiz and Santana the day after the murders to burn some shoes and clothing. He testified that they burned the pair of brown tennis shoes Ruiz had changed out of the night before, and the blue Levi's and white or grayish tennis shoes with blue stripes that Teresa had been wearing. Santana testified that they burned the jacket, corduroy pants, and gray Trax tennis shoes that defendant had been wearing.

At the desert site where defendant had helped Ruiz burn the various items, detectives found a small zipper tab and Levi Strauss button from a pair of pants or a coat, and four burned shoe soles. Two of the soles had a

---

[4] Santana also testified that Ruiz changed his pants during the stop. A pair of pants seized from Ruiz's apartment after his arrest were splattered with blood. Blood samples from Jack and Carol Hayes, Ruiz, Teresa and defendant were examined. Of those five, the blood on the pants could only have come from Carol Hayes.

herringbone Cornet brand pattern and two had a rectangular Trax brand pattern. The burned soles with the herringbone pattern matched in size and style a pair of new shoes, brown in color, that Ruiz purchased the day after the murders. Greater uncertainty developed over the soles with the rectangular Trax pattern and whether they could have been worn by defendant or Teresa.

Teresa testified that she wore Trax tennis shoes in a boy's size 5 in April 1982. A pair of Trax in a boy's size 6 was too big for her at the time of trial; defendant testified that the same pair felt too small for him, but that he could probably wear them. An expert testified, after measuring Teresa's feet, that she could wear a boy's size 4½ or 5, which would be the equivalent of a girl's size 6 or 6½. Defendant, on the other hand, would wear a boy's size 6½; a girl's size 6 did not fit him during an in-court experiment.

The Trax soles found in the remains of the fire proved to have the number "6" inside layers of the sole. The police investigator, however, did not know if the number referred to a girl's size 6 or a boy's size 6. The best preserved of the two soles measured 9½ inches in length, but part of the sole, perhaps as much as half an inch, was burned off. The expert witness testified that the sole of a *Keds* brand jogging shoe in a girl's size 6 measured 9½ inches in length. As the expert also testified that each half size accounts for a sixth of an inch in length, a 10-inch sole would correspond to a girl's size 7½ or boy's size 6, which defendant, but not Teresa, might wear. The sole of a *Trax* shoe in a boy's size 6 submitted as a prosecution exhibit, however, proved to measure approximately 10½ inches in length, and a 10-inch sole in that brand would then correspond to a boy's size 4½ or girl's size 6, which Teresa, but not defendant, could wear.

This evidence, especially the showing that Cornet brand tennis shoes had been burned, strongly supported Ruiz's involvement in the crime, but was less conclusive as to defendant. Given that only defendant, and his brother and sister, had him wearing Nike tennis shoes and that all other witnesses testified he was wearing Trax brand tennis shoes, the burned Trax shoe soles tended to link defendant to the murders, as did the Levi Strauss button and the zipper tab.[5] Defendant's attempt to suggest that the latter items were from Teresa's jeans was internally inconsistent since his testimony had her changing *from* the pair of bloody pants he supposedly burned *into* Levi's jeans.

*Defendant's Jailhouse Conversations.* On the afternoon of April 14, 1982, the day before he was arraigned, defendant was allowed to have several

---

[5]None of the other items found in the fire residue could be linked any more directly with defendant.

visitors—including his father, his brother Armando, his sister Maria, and Santana's sister Carmen—at the county jail and was allowed to see them in a group rather than two at a time, as was the more usual jail practice. Portions of the transcript of these secretly recorded conversations were introduced into evidence.

In the conversations, defendant asserted his innocence of the charges but also made several arguably incriminating statements. He asked Carmen, and requested that his visitors ask Santana, and Tina and Sherry H., not to testify against him. He suggested to his brother and sister stories they could tell to suggest that Teresa was hallucinating from acid and thus discredit her testimony. He asked his sister to say that he was babysitting her children on the night of April 7, that he did not go out that evening, and that Ruiz went out alone. He also asked her to testify, as she did, that he was wearing Efrain's Nike tennis shoes that evening, and talked to his brother about his and Efrain's different shoe sizes. He directed his brother to the location of the partially burned clothing and asked him to collect this evidence and dump it in a mine shaft in the desert. He complained that Ruiz had messed everything up by purchasing new Cornet tennis shoes that had the same footprint as the old ones and, when told the police had seized Ruiz's pants, said he thought Ruiz had burned them.

While in jail, defendant wrote several letters to Patience S., Tina H., Sherry H. and Ruiz's former girlfriend. Excerpts from a few of these letters—asking the recipients to back him up, complaining about "snitches," and worrying that he and Ruiz would be "up [the] creek" if Teresa and Santana testified—were read to the jury.

Defendant's conversations and letters cast significant doubt on the credibility of the few witnesses who testified that defendant was not gone from the gathering at Carmen's house between 9 and 10 p.m. on April 7, that he was not wearing gray Trax brand tennis shoes that evening, or that they could not remember his movements or what clothing he was wearing.

PENALTY PHASE EVIDENCE

The prosecution called two additional witnesses at the penalty phase of the trial. Dorothy Hahnenkratt, the mother of Carol Hayes, testified that both Jack and Carol Hayes needed to wear glasses to see, that she had told Carol, if there was ever a robbery, to give the robbers the money or whatever they wanted, and that her daughter always avoided physical confrontation and never quarreled. Julius Jones, one of the inmate witnesses, testified that after his testimony at the guilt phase, he overheard defendant telling three trustee inmates that Jones was a dead man when he got to prison and

that defendant would kill him. He said that these inmates later brought him defendant's message.

The defense presented extensive evidence of defendant's behavior and drug use. Defendant's sister Maria testified she had seen him smoke marijuana, drink and take acid. He had used all three on the day of the murders. He was drunk and slurring his words that day. Defendant's cousin testified that he had seen defendant take drugs and that when he took "reds" and "yellows" he would act wild and nervous. Defendant testified that he had used marijuana, cocaine, alcohol, "crank" (a substance "like cocaine . . . kind of like a speed"), PCP and heroin. He claimed that he had experienced flashbacks from taking acid, but did not point to any particular effect on the day in question and, indeed, had testified at the guilt phase that he had not been affected by the acid he took the day of the murders.

Defendant's mother testified that he was her eldest son and that she had no problems with him when he was in school. Defendant's father was a good man when he was sober, but would become violent and beat her and the children when he got drunk. She divorced him in 1975, and defendant had since lived with his father. Defendant had always been respectful to her, had never hurt her, and she had never seen him fight or exhibit violent behavior.

A psychopharmacologist testified for the defense on the effects of taking LSD, and on the cumulative effect of taking LSD on top of marijuana and alcohol usage. He indicated that the effects of the LSD could be intensified by use of the other substances and that a person in that state might be subject to "hypersuggestability," capable of being easily influenced to commit a robbery he would not otherwise commit. He further testified that such a person might become overly aggressive and commence stabbing a victim without thinking, impulsively responding to a perceived threat. The witness also acknowledged on cross-examination, however, that the effects of the drugs would be difficult to assess and that he would tend to respect an individual's subjective evaluation that LSD had, on a given occasion, had no effect.

Finally, the defense challenged the prosecution's allegation that defendant had threatened inmate witness Jones. The three trustee inmates to whom defendant had allegedly communicated the threat each denied having a conversation with defendant on the day the threat was allegedly made and denied being told such a threat or passing it on to Jones. Defendant

testified that he had been returned to a different cell block than Jones after the guilt phase of the trial and thus could not have made the threat.[6]

## DISCUSSION

### GUILT PHASE ISSUES

Defendant raises 12 allegations of error, some with subsidiary arguments, at the guilt phase. As we shall point out, his contentions for the most part lack any merit. And where error appears, it must be viewed as harmless.

*1. Aiding and Abetting Instructions.* ■ Defendant contends that the jury was not properly instructed under *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] and *People* v. *Caldwell* (1984) 36 Cal.3d 210 [203 Cal.Rptr. 433, 681 P.2d 274], that an alleged aider and abettor must have and act with his own "intent or purpose either of committing, or of encouraging or facilitating commission of, the offense" *(Beeman, supra,* 35 Cal.3d at p. 560), in addition to knowing the criminal purpose of the actual perpetrator.[7] The People concede error, but contend that the error was not prejudicial in the circumstances of this case. We agree.

Under defendant's version of the events, he was not present at the Imperial 400 Motel on April 7, 1982, and took no part in the killings. He claimed his only participation in the crimes lay in assisting with the destruction of evidence the day after the killings. Defendant contends the jury could have believed his testimony and still have convicted him of murder and robbery, by finding that he had acted with knowledge of the unlawful purpose of the perpetrator of the crimes and that his actions had aided the commission of the offenses, because (1) no instruction was given on his potential liability under section 32 as an accessory after the fact, and (2) the jury was instructed under CALJIC No. 4.51 that "if the evidence establishes beyond a reasonable doubt that the defendant aided and abetted the commission of the offense charged in this case, the fact, if it is a fact, that he was not present at the time and place of the commission of the alleged offense . . . is

---

[6] A deputy sheriff testified that defendant had been transferred to a different cell block from that of Jones after the guilt phase but that the computer records had not been changed promptly and it was possible that defendant had been returned to the same cell block upon his return from court.

[7] The jury was given the general instructions (all CALJIC jury instructions referred to, unless otherwise noted, are from the 4th ed. 1979) on aider and abettor liability—CALJIC No. 3.00 (1981 rev.) and CALJIC No. 3.01 (1980 rev.)—found deficient in *Caldwell, supra,* 36 Cal.3d at pages 223-224, and *Beeman, supra,* 35 Cal.3d at pages 560-561, respectively, for failing to require the jury to find that an aider and abettor had his own criminal intent. That same defect was present in the specific instruction—CALJIC No. 8.27—given as to the liability of an aider and abettor for first degree felony murder-robbery.

immaterial and does not, in and of itself, entitle him to an acquittal." (Cf. *People* v. *Croy* (1985) 41 Cal.3d 1, 15 & fn. 9 [221 Cal.Rptr. 592, 710 P.2d 392].)

Defendant's failure to request an instruction on the elements of accessory after the fact to murder would bar any direct challenge to the verdicts on the ground that such an instruction was not given (*People* v. *Hall* (1985) 168 Cal.App.3d 624, 626 [214 Cal.Rptr. 289] [no duty to instruct sua sponte on lesser related offenses]; see *People* v. *Geiger* (1984) 35 Cal.3d 510, 530 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]), and defendant has not attempted to mount such a challenge here. He contends, however, that the absence of such an instruction precludes us from finding the *Beeman* error harmless on the rationale that the jury must have rejected defendant's alibi defense. (Cf. *People* v. *Leach* (1985) 41 Cal.3d 92, 105-106 [221 Cal.Rptr. 826, 710 P.2d 893]; *People* v. *Johnson* (1986) 183 Cal.App.3d 314, 322 [227 Cal.Rptr. 917].) Not so.

The *Beeman* error must be viewed as harmless if, under other proper instructions, the jury necessarily determined that defendant acted with the requisite intent to aid the commission of the crimes. (*Croy, supra,* 41 Cal.3d at p. 13; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].) As the People point out, the jury was instructed that to find the special circumstance of felony murder-robbery to be true, it must find, inter alia, that defendant "[i]f . . . not the actual killer, . . . intentionally aided . . . or assisted the actual killer in the commission of the murder in the first degree" and that "the murder was committed in order to carry out or advance the commission of the crime of robbery." The People assert that the jury's finding on the special circumstance under these instructions demonstrates that the jury necessarily determined defendant intended to aid and abet the underlying robbery. (*People* v. *Gonzales* (1986) 192 Cal.App.3d 799, 806-808 [238 Cal.Rptr. 554].)

Defendant's argument to the contrary hinges on the proposition that the special circumstance instructions still left open the possibility that the jury could have based its decision on a finding that defendant committed an intentional act that aided the robbery without necessarily finding that defendant had the intent to bring about the crime. That is, he argues that although the jury found he "intentionally aided" the commission of first degree murder, the predicate finding of first degree murder could itself have been based on the felony murder-robbery theory. The jury's decision, he asserts, thus does not compel the conclusion that the jury found he intended, within the meaning of *Beeman, supra,* 35 Cal.3d 597, to aid the commission of the crime. (See *Croy, supra,* 41 Cal.3d at pp. 11-12 & fn. 5.)

In *People* v. *Warren* (1988) 45 Cal.3d 471 [247 Cal.Rptr. 172, 754 P.2d 218], we rejected the possibility that a reasonable juror would read the special circumstance instruction in such a "hypertechnical manner" (*id.* at p. 488), and we concluded that the instruction adequately advised a jury of the need to find that an aider and abettor had the intent to kill before the felony-murder and multiple-murder special circumstances could be found to be true. (*Id.* at pp. 487-488; but see *id.* at p. 490 [conc. opn. of Arguelles, J.]; *Beeman, supra,* 35 Cal.3d at pp. 560-561.) Our conclusion there that the instruction was adequate compels the conclusion here that the jury necessarily rejected defendant's version of the events and that the *Beeman* error accordingly was harmless beyond a reasonable doubt. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Dyer* (1988) 45 Cal.3d 26, 64 [246 Cal.Rptr. 209, 753 P.2d 1].)

*2. Failure to Give Jury Unanimity Instruction.* ██ Defendant next challenges the robbery conviction alone, seeking independently of the *Beeman* error to set aside his convictions for felony murder-robbery by contending that the trial court erred in failing to instruct the jury under CAL-JIC No. 17.01 that it had to agree unanimously on the act or acts constituting the underlying crime of robbery. ██ ██ ██ ██ ██ Defendant was charged with one count of robbery of two victims, and he asserts the instruction was required to avoid the possibility that some jurors may have found him guilty of robbing one of the victims and the rest guilty of robbing the other.[8]

By asserting that multiple acts were involved, defendant incorrectly assumes that the critical question is whether one or two robberies was committed. But here Jack and Carol Hayes were the joint custodians of the motel receipts, and the funds were taken from the immediate presence of both of them by force or violence as to both. Although two counts of robbery could have been charged (*People* v. *Ramos* (1982) 30 Cal.3d 553, 589 [180 Cal.Rptr. 266, 639 P.2d 908], revd. on other grounds *sub nom. California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446]), defendant can hardly complain that he was charged here with but one count of robbing two victims. It was not necessary that the jury distinguish between the two victims as there was no evidence here from which the

---

[8]The instruction was initially requested by the prosecution but was not given, apparently because the trial court and both counsel believed that no question of multiple acts was involved in the case. Defense counsel had not raised any objection to the instruction—much less a specific one that could constitute invited error—and counsel's mere agreement that the instruction was not relevant does not preclude defendant from raising the issue on appeal, as a trial court should give the instruction sua sponte where the circumstances of the case so dictate. (*People* v. *Wesley* (1986) 177 Cal.App.3d 397, 401 [223 Cal.Rptr. 9]; see *People* v. *Wickersham* (1982) 32 Cal.3d 307, 330-332 [185 Cal.Rptr. 436, 650 P.2d 311].)

jury could have found defendant was guilty of robbing one of the victims and not the other. (Cf. *People* v. *Diedrich* (1982) 31 Cal.3d 263, 282-283 [182 Cal.Rptr. 354, 643 P.2d 971].) Defendant did not proffer different defenses as to the allegedly different acts, and even the testimony of Teresa and Santana—which suggested that defendant took no part in the attack on Jack Hayes—would not affect his culpability as an aider and abettor for the robbery as to Jack.

*3. Instruction on Nonprosecution of Others.* Defendant next objects that the jury was instructed under CALJIC No. 2.11.5 not to consider why other persons were not being prosecuted for the crimes.[9] He contends that this instruction undercut his defense—that Teresa, not he, was Ruiz's accomplice—and that the instruction prevented the jury from evaluating the bias of Teresa and of Santana, both of whom testified under grants of immunity from prosecution.[10]

The instruction should not have been given. Two witnesses—a mother and daughter—had testified that, while they were watching a Little League baseball game in Mojave, Teresa admitted to them that she committed the crimes and that defendant was covering for her. The daughter and her two stepsisters testified to a second set of substantially identical admissions made by Teresa later that day while they were playing in a Mojave park. Defendant contends the jury might have understood the instruction to mean that it should not consider the testimony that Teresa, not defendant, committed the crimes. In addition, the testimony as to Teresa's alleged admissions and the testimony of the inmate witnesses that Santana drove defendant and Ruiz to the motel and acted as a lookout also suggested that the grants of immunity to Teresa and Santana might have exonerated them from potential murder charges. But the jury might have understood the instruction to preclude it from considering whether this gave Teresa or Santana a strong incentive to testify favorably to the prosecution. (See *People* v. *Garrison* (1989) 47 Cal.3d 746, 779-780 [254 Cal.Rptr. 257, 765

[9] The instruction, as given, provides: "There has been evidence in this case indicating that a person other than the defendant was or may have been involved in the crime for which the defendant is on trial. [¶] You must not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he or she has been or will be prosecuted." The use notes for the instruction specifically provide: "This instruction is not to be used if the other person is a witness for either the prosecution or the defense." This admonition should be heeded. (*People* v. *Marks* (1988) 45 Cal.3d 1335, 1346-1347 [248 Cal. Rptr 874, 756 P.2d 260].)

[10] There would have been no problem in giving the instruction here had the trial court modified it to limit its application to Ruiz and why he was not being prosecuted in defendant's trial. Even an instruction that the jury should not consider whether some unspecified "he" would be prosecuted would not have created the same problem as the clear reference to Teresa occasioned by the use of "he or she" in the instruction as given.

P.2d 419]; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1312-1313 [248 Cal.Rptr. 834, 756 P.2d 221].)

The potential for such a misunderstanding of the instruction appears minimal, however, and the error in giving the instruction accordingly harmless. The jury was instructed under CALJIC No. 1.01 "to consider all the instructions as a whole and . . . to regard each in light of all the others. . . ." The jurors were also instructed in the language of CALJIC No. 2.20 (1980 rev.) that "[i]n determining the believability of a witness you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness, including . . . [t]he existence or nonexistence of a bias, interest, or other motive [and] [e]vidence of the existence or nonexistence of any fact testified to by the witness . . . ." Rather than being "countermanded" or "nullified" by CALJIC No. 2.11.5, as defendant posits, CALJIC No. 2.20, considered with other instructions given,[11] delivered a correct interpretation of the law. (See *Garrison, supra,* 47 Cal.3d at p. 780; *People* v. *Silva* (1988) 45 Cal.3d 604, 627 [247 Cal.Rptr. 573, 754 P.2d 1070].) Whether we apply a *Chapman* "harmless beyond a reasonable doubt" standard (*Chapman, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711] [error affecting defendant's right to confront witnesses and present a defense]) or merely seek to determine if it is reasonably probable a result more favorable to defendant would have been reached had CALJIC No. 2.11.5 not been given (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] [error affecting jury's evaluation of witness credibility]), defendant cannot have been prejudiced.

*4. Instruction on Flight as Evidence of Guilt.* The jury was instructed under CALJIC No. 2.52 that flight after crime may be considered as evidence of guilt. ■ Relying on *People* v. *Parrish* (1986) 185 Cal.App.3d 942, 946-948 [230 Cal.Rptr. 118], and a line of cases running back to *People* v. *Anjell* (1979) 100 Cal.App.3d 189, 199-202 [160 Cal.Rptr. 669], defendant asserts that the instruction should not have been given because he denied participation in the crimes and proffered an alibi defense.

Defendant's reliance on these cases is misplaced, and the giving of CALJIC No. 2.52 was not error. (See also *People* v. *Cowger* (1988) 202 Cal.App.3d 1066, 1073-1076 [249 Cal.Rptr. 240].) The instruction was not

---

[11] The jury was also given a series of instructions (CALJIC Nos. 3.10, 3.11, 3.12, 3.14, 3.18 and 3.19) on the testimony of accomplices and corroboration requirements for accomplice testimony, which might independently have operated to aid the jury in evaluating the testimony of Teresa and Santana. Moreover, the prosecutor did not even suggest in his arguments that the jury could not consider the grants of immunity in assessing the credibility of the two, and defense counsel argued strenuously that the jury should question Teresa's and Santana's testimony on this score.

directed at an immediate flight after crime, but at defendant's later escape from the county jail.[12] His escape from jail after being arrested and charged with the crimes was properly admissible as indicating consciousness of guilt. (*People* v. *Holt* (1984) 37 Cal.3d 436, 455 [208 Cal.Rptr. 547, 690 P.2d 1207].) Although it would have been preferable had the trial court deleted any reference in the instruction to flight "immediately after the commission of a crime" and instructed the jury only as to flight after defendant was "accused of a crime," the prosecutor's argument made clear to the jury that only defendant's escape from jail was implicated by this instruction.

*5. Informant Witness Instruction.* Defendant next challenges the failure of the trial court sua sponte to instruct the jury that the testimony of informants, like that of accomplices, should be viewed with care and caution, and with distrust. Although conceding that, under *People* v. *Alcala* (1984) 36 Cal.3d 604 [205 Cal.Rptr. 775, 685 P.2d 1126], the testimony of informants is not subject to the same corroboration requirements as that of accomplices, defendant contends that the giving of cautionary instructions as to accomplice testimony[13] and the failure to give such instructions as to informant testimony permitted the jury to infer that the highly damaging testimony of the inmate informant witnesses in this case was entitled to greater credence than the relatively more favorable testimony of Teresa and Santana.[14]

■ In *People* v. *Hovey* (1988) 44 Cal.3d 543, 565-566 [244 Cal.Rptr. 121, 749 P.2d 776], relying on *Alcala*'s rationale, we concluded that there was no sua sponte duty to give cautionary instructions on informant testimony. We are not persuaded that any different rule is warranted simply because such instructions were properly given as to accomplice testimony.

Moreover, the jury was fully instructed here on the credibility of witnesses generally, and with CALJIC No. 2.23 (Credibility of Witnesses—Conviction of Felony), specifically. It is not reasonably probable a result

---

[12] Defendant apparently took advantage of an escape planned by other jail inmates to escape himself. He was recaptured in short order five blocks from the jail, and used no force and made no attempt to resist or to run.

[13] In light of the testimony purporting to link Teresa and Santana to the commission of the crimes, the jury was properly given instructions on the definition and credibility of accomplices (*People* v. *Gordon* (1973) 10 Cal.3d 460 [110 Cal.Rptr. 906, 516 P.2d 298]), including CALJIC No. 3.18: "The testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case."

[14] That the relative credibility of the two sets of witnesses may have been significant in this case is demonstrated by the jury's request, shortly into its deliberations, for reinstruction on the testimony of felons and accomplices. (Cf. *Beeman*, *supra*, 35 Cal.3d at p. 547.)

more favorable to defendant would have been reached had cautionary instructions been given. (*Watson, supra,* 46 Cal.2d at p. 836.)

*6. Prosecutorial Misconduct.* Defendant raises a series of objections to the prosecutor's conduct in this case and separately complains of (a) the trial court's failure to restrain the prosecutor, (b) limitations placed by the court on the defense cross-examination of Santana, and (c) the admission of hearsay evidence from Santana's younger brother. Although framed by defendant as separate issues on appeal, whether the trial court erred on those other points is mainly relevant to a determination whether defendant's failure to object to the prosecutor's actions bars him from assigning them as error on this appeal. As such, the contentions are sufficiently interrelated to warrant consideration under the general rubric of prosecutorial misconduct.

*A. Use of Tainted Testimony.*　██　Defendant's first objection is that the prosecutor presented testimony from Santana that contradicted testimony the same prosecutor had elicited from Santana at the separate trial of Ruiz a few weeks before. Defendant asserts that Santana's testimony was false on at least one of the occasions and that his conviction cannot stand due to the attendant corruption of the fact-finding process.[15]

As noted previously, Santana (along with Teresa) was one of the prosecution's main witnesses. He provided critical testimony on defendant's whereabouts the night of the killings, on defendant's clothing and changes in clothing that evening, and on defendant's statements to him of what transpired at the Imperial 400 Motel. On a few points, however, Santana's testimony at defendant's trial arguably differed from the testimony he gave at Ruiz's trial.

At Ruiz's trial, Santana testified that Ruiz told him about the killings; at defendant's trial, Santana testified that defendant told him about the killings. Defendant does not make much of this discrepancy, and in fact there may be no conflict. Santana also testified at defendant's trial that Ruiz went back and forth between the motel room that Santana shared with defendant and the one Ruiz shared with Teresa, and both Ruiz and defendant may at different times have told Santana what happened earlier that evening. Supporting this interpretation is the fact that Santana also testified at Ruiz's trial that defendant was in the room while Ruiz told him what happened, while he testified at defendant's trial that Ruiz was not present when de-

---

[15] The trial court made Santana's testimony at the Ruiz trial part of the record on this appeal, thus permitting us to consider defendant's contentions to the extent they are based on inconsistent testimony by Santana. To the extent defendant's contentions rest on other aspects of the Ruiz trial, they are not properly before us here.

fendant told him what happened. Neither of these inconsistencies amounts to much, except that at each trial Santana also put substantially the same words in the mouth of a different speaker.

At Ruiz's trial, Santana testified that Ruiz—before leaving the gathering at Carmen's house—asked him "if I had the nerve to kill somebody." The prosecutor had Santana verify that Ruiz made the statement and returned to the point later, asking "[w]hen did Ramiro [Ruiz] ask you the question if you had any guts to kill anybody?" At defendant's trial, Santana testified that defendant was the one who asked him—before leaving the gathering— "[i]f I had the guts to kill someone." While the phrasing was very similar, this alleged conflict might also be due to nothing more than both Ruiz and defendant making similar comments.

At Ruiz's trial, Santana testified that Ruiz told him about a knife breaking when Ruiz was stabbing the male victim. "Q. Did Ramiro [Ruiz] say anything about what he used on the man? A. Said he had a knife. Q. What did he say about the knife in reference to the man? A. When he stabbed him it broke, and after he broke [it] he went inside his kitchen and got a bigger knife. Q. Ramiro told you that the knife he used on the man broke? A. Yes, he did. Q. Did he say where in the kitchen he got this other bigger knife? A. One of the drawers." The prosecutor allegedly argued to the Ruiz jury that the knife broke while Ruiz was stabbing the man and that Ruiz went into the kitchen to get another knife.

At defendant's trial, Santana's testimony on this point was ambiguous. "Q. Did defendant tell you anything more in reference to what he and Ramiro [Ruiz] did in the motel? A. That when Ramiro was stabbing the people, that the knives broke off and he went inside the kitchen and got a bigger knife." The identity of the "he" in question was not pursued in the questioning of Santana, and there is nothing inherently improper in Santana's testimony or even any plain conflict. The prosecutor argued to the jury in defendant's case, however, that *defendant* was the one who obtained the knife from the motel kitchen. "According to Miguel [Santana], [defendant] went into the hotel to rob it, according to defendant. The knife broke off and he went into the kitchen to get a larger knife. Same thing we heard from other witnesses, jail witnesses."[16]

---

[16]The jury had not heard the "same thing" from other witnesses, however, although inmate witness Hill had testified that "[w]hen they stabbed the man in the chest, the knife broke, and . . . Tino [defendant] ran into the kitchen, got another knife and came back and stuck him in the head, and when they stuck him in the head the knife broke. Then they got another knife, and they stabbed him in the throat."

Santana's testimony at the two trials thus seems to have differed in possibly significant respects,[17] and the prosecutor may have argued inconsistent versions of the crimes to the two juries. Defendant raised no objections to the prosecutor's questions or arguments thereon (see *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468]), however, and as review would require us to examine matters outside the present appellate record, these points are not properly before us on this appeal. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 426, fn. 17 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)[18]

*B. Improper Direct Examination.* Defendant objects that the prosecutor asked questions of two witnesses that assumed the existence of prejudicial facts not then or later placed in evidence. Except as to two points, defendant did not object to the lines of questioning and, as the alleged errors could have been cured by timely objection and prompt admonition, he may not now complain of them on appeal. (*Green, supra,* 27 Cal.3d at p. 34.)

During the questioning of Teresa, the prosecutor asked if she recalled telling a police investigator how many knives defendant told her that he and Ruiz had taken with them to the Imperial 400 Motel. She denied recalling having given the investigator a number, and no evidence was ever introduced of any statement by Teresa on this subject.[19] Defendant did not object to these questions, however, and the jurors were specifically instructed under CALJIC No. 1.02 that they "must never assume to be true any insinuation suggested by a question asked a witness. . . ."

Defendant also asserts misconduct in the prosecutor's rebuttal questioning of Teresa, in the course of which Teresa, then nine months pregnant, was asked whether defendant was the father of her child. Defense counsel's

---

[17] In addition to the points previously noted, defendant complains of inconsistencies in Santana's testimony at the two trials on the color of the shoes defendant and Ruiz were wearing on the evening of the killings. The testimony of all witnesses was so inconsistent on this point that we are hard pressed to see any basis for a claim of misconduct—or any prejudice to defendant.

[18] The issue here is not so much one of inconsistencies in Santana's testimony as allegedly improper argument by the prosecutor. That question is outside the scope of this appeal, as the arguments at the Ruiz trial are not part of the appellate record. The issue was raised separately in a petition for writ of habeas corpus, which a majority of this court ultimately denied for failure to state a prima facie case.

[19] Defendant also complains in a footnote of the introduction of part of a tape-recorded statement made by Santana's sister Carmen to a police investigator, in which Carmen denied that defendant's sister Maria had told her of missing some knives from her kitchen. Although defense counsel objected to admission of the statement on relevancy and hearsay grounds, she did not object on the grounds now asserted. In any event, the statement showed at most that the police had attempted, unsuccessfully, to learn if defendant and Ruiz had taken knives with them to the hotel and may, if anything, have helped defendant's case.

repeated objections to this line of questioning were sustained on relevancy grounds, and defendant now appears to assert misconduct in the prosecutor's pursuit of the topic—by asking whether she had been pregnant previously and whether she had ever had sexual relations with defendant—despite the court's rulings. Given that the defense objections were sustained and that defense counsel did not seek to have the jury admonished to disregard Teresa's answers to the few questions that preceded the final objection, we fail to see a basis for claiming misconduct or prejudice. In any event, the testimony would seem to have been relevant, in light of the fact that other witnesses had testified to statements allegedly made by Teresa that defendant loved her, that she was pregnant by him and that he was taking responsibility for the killings to protect her.

Defendant asserts similar misconduct in the prosecutor's questioning of inmate witness Jones about a note sent to him allegedly promising him $5,000 if he kept quiet concerning defendant's case and about alleged threats and attempts to poison his food. The prosecutor's attempts to link defendant to these incidents were unsuccessful, but defendant asserts that the questions enabled the prosecutor to put before the jury unsubstantiated inferences of other criminal activity by defendant and that the prosecutor committed misconduct in arguing to the jury that defendant had threatened people in jail. (See *People* v. *Perez* (1962) 58 Cal.2d 229, 240-241 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946].) But, as before, defense counsel made no objection to the questions and, in light of other testimony by Jones that defendant had threatened him and testimony that defendant had attacked Teresa's brother while both were in jail, the prosecutor's argument was legitimate.

*C. Abusive Cross-examination.* ■ The prosecutor's cross-examination of defendant was marked by multiple objections from defense counsel on the grounds that the questions were argumentative or based on prejudicial facts not in evidence. The trial court sustained defense objections to 28 questions, but denied counsel's motion for a mistrial. Defendant now contends that it was prejudicial misconduct for the prosecutor to belittle and harass defendant,[20] and complains that the prosecutor improperly injected

[20] A representative sample of the questions, with emphasis on specific portions to which defense counsel's objections were sustained, may give a sense of the tone of the proceedings. "Q. So how many people did you discuss the case with before *deciding* on what to testify to? . . . Q. So you were not being truthful when you talked to certain individuals in the jail on tape, but *all of a sudden* now you are being truthful, is that correct? . . . Q. Is there some reason for this *transformation*? . . . Q. You are afraid of being prosecuted for perjury? . . . Q. You were out of money but, *of course,* you were not trying to borrow money [from another friend]? . . . Q. Did [some T.V. dinners at Maria's house] just happen to appear there *miraculously* when you went there? . . . Q. You have been saying Maria and Carmen are lying,

into the guilt phase of the trial the subject of the death penalty by asking defendant whether "a snitch jacket in prison [for blaming the killings on others] is worse than going to the gas chamber on these murders?"

We do not condone the prosecutor's manner of cross-examining defendant in this case. (See *Hawk* v. *Superior Court* (1974) 42 Cal.App.3d 108, 125 [116 Cal.Rptr. 713].) But the fact remains that defense counsel's objections were sustained. If counsel believed that a potential for prejudice remained, she should have requested a specific admonition to the jury. And the jurors were instructed under CALJIC No. 1.02: "As to any question to which an objection was sustained, you must not guess what the answer might have been or as to the reason for the objection. . . . [¶] You must not consider for any purpose . . . any evidence that was stricken out by the court; such matter is to be treated as though you had never heard of it."

We cannot see prejudicial error in the prosecutor's cross-examination, nor does the passing reference to the gas chamber require reversal. Defense counsel did not object to the question; defendant himself later testified that he had decided finally to tell the truth because he did not "think it is right for me to go to the gas chamber" for something he did not do; and the jury was specifically instructed under CALJIC No. 8.83.2 to disregard the subject of penalty or punishment in the course of its deliberations.

*D. Closing Argument.* ▮▬▬▬ Defendant also contends that the prosecutor committed misconduct during closing argument by again asserting as proven facts on which no evidence had been introduced: (1) that defendant might have attempted to escape in order to confront and threaten witnesses; (2) that defendant made four separate admissions to four separate people that he and Ruiz killed the couple; (3) that the female victim "had her wrist cut off" during the attack; (4) that defendant threatened to stab Teresa's brother and had "others beat up witnesses" to silence them; (5) that defendant's concern with being seen as a "snitch" showed that he was part of a "gang" or had a "gang mentality"; (6) that the victims were tortured; (7) that the killings were premeditated; and (8) that defendant asked Santana, "Have you ever killed before?"—implying that he might previously have murdered someone.[21]

---

too? . . . Weren't you able to get enough letters to them? . . . Q. Well, you are a pretty proficient liar, aren't you?"

[21] In addition, defendant contends that the prosecutor again brought the subject of the death penalty before the jury by arguing that defendant tried to get members of his family to lie for him "[w]hen he realized his life [was] at stake . . . ." We have recognized that where avoidance of a special circumstance or the death penalty was a possible motive for defendant's acts or testimony, the prosecutor may properly cross-examine and seek to impeach the defendant by establishing such a motive. (See *People* v. *Allison* (1989) 48 Cal.3d 879, 892 [258 Cal.Rptr. 208, 771 P.2d 1294].) This passing reference, in the midst of a lengthy discussion of

The People offer no substantive response to these contentions, and we agree the prosecutor may have stepped over the line of permissible argument. (*People v. Kirkes* (1952) 39 Cal.2d 719, 724 [249 P.2d 1]; see *People v. Bolton* (1979) 23 Cal.3d 208, 213 [152 Cal.Rptr. 141, 589 P.2d 396].) There was no basis for a suggestion that defendant sought to escape in order to intimidate witnesses. He did not admit killing the couple in his statements to Teresa and Santana; both testified that defendant admitted to nothing more than cutting the female victim on the wrist. The female victim's wrist was cut but not "cut off," and no allegations of torture were made in the case. And Santana's testimony was that defendant asked him "Do you have the guts to kill someone?"—not "Have you ever killed before?" These statements were not simple hyperbole or slight exaggerations in the heat of argument; they were misstatements of the record and potentially prejudicial to defendant's case.

As in so many other instances, however, defense counsel did not object— except as to the reference to "a torture situation" on which point the trial court sustained the objection on the ground that the prosecutor had gone beyond proper argument. The misstatements, although bearing a potential for prejudice, were not so extreme or so divorced from the record that they could not have been cured by prompt objections and admonitions. (*People v. Murtishaw* (1981) 29 Cal.3d 733, 759, fn. 21 [175 Cal.Rptr. 738, 631 P.2d 446].) The record reveals no explanation for defense counsel's failure to object, and the question would thus be cognizable only on habeas corpus as part of a claim of ineffective assistance of counsel. (See *Pope, supra,* 23 Cal.3d at pp. 425-426.) The matter is not properly before us here.[22]

*E. Trial Court Errors.* Defendant also complains of trial court errors that permitted, exacerbated or failed to cure the impact of the above instances of alleged prosecutorial misconduct. He briefly asserts, with little supporting argument beyond a reference to section 1044[23] and quotations of general principles from past decisions, that the prosecutor's misconduct was so pervasive that the court on its own motion should have either admonished the jury to disregard the questions and closing argument or granted a mistrial. We cannot agree.

the lack of credibility of defendant and his witnesses, seems unlikely to have affected the jury verdict in light of the express instructions later given the jury not to consider the subject of penalty in its deliberations on guilt.

[22] Defendant's claim of ineffective assistance of counsel was also raised in his unsuccessful petition for writ of habeas corpus. (*Ante,* p. 317, fn. 18.)

[23] The statute provides: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

First, much of what defendant finds objectionable in the prosecutor's conduct would not necessarily even have been apparent to the court. That the testimony of Santana was inconsistent with his testimony at Ruiz's trial and that the prosecutor might have argued a different version of the facts in that proceeding could have been known only by one who had reviewed the transcript of the Ruiz trial. And, to the extent that a basis for objection might have been apparent, the court was not obligated to intervene sua sponte as defense counsel might well have had a tactical reason for not objecting. We will not fault a trial court for exercising appropriate caution.

■ More to the point, a trial court has no sua sponte duty to control prosecutorial misconduct; the authority defendant relies on to urge such a duty is no longer valid. Defendant looks to *People* v. *Perez, supra,* 58 Cal.2d at pages 249-250, to support his argument that his conviction cannot stand because the trial court failed on its own motion to correct the prosecutor's misconduct or to grant a mistrial. But *Perez* relied on the "close case" exception of *People* v. *Lyons* (1958) 50 Cal.2d 245, 261-262 [324 P.2d 556] to excuse the defendant's failure to object at trial—an exception that *Lyons* drew from the inartful phrasing of *People* v. *Berryman* (1936) 6 Cal.2d 331, 337 [57 P.2d 136]. In *People* v. *Green, supra,* 27 Cal.3d 1, we overruled *Berryman* and its progeny on this point and explained that the "close case" rule was not an exception to the requirement that a defendant object to preserve an issue for appeal but rather a statement of the test for prejudice if the issue had, by objection, been preserved. (*Id.* at pp. 27-34.) That is, the erroneous denial of an objection may, in a close case, warrant reversal, but that a case is close does not in and of itself excuse the failure to object or impose a duty on the trial court to intervene in the absence of objection. (See *People* v. *Poggi* (1988) 45 Cal.3d 306, 335-336 [246 Cal.Rptr. 886, 753 P.2d 1082].)

Nor do defendant's more specific claims of trial court error withstand scrutiny. Defendant objects that the court improperly limited the cross-examination of Santana. It was and remains the case that defendant failed to establish a basis for impeaching Santana with his testimony at the Ruiz trial; that is, defendant failed to apprise the court of any inconsistencies in Santana's testimony that would have justified such a line of questioning. (See also *ante,* fn. 18.) And, in light of other testimony at trial (see *post,* pp. 322-323), we would be compelled to conclude that any error the trial court might have committed in this regard could not have prejudiced defendant. Defendant also objects to the trial court's ruling permitting Santana's younger brother to testify that three months prior to the killings Ruiz told him he had lost his job at the Imperial 400 Motel and allowing the prosecutor to bring out that the witness had told police that Ruiz had said he "would get even." Even assuming that the statement should not have been

allowed into evidence, the testimony was equivocal—as the witness testified he did not recall either that Ruiz had made that statement or that he had told police of it—and any error was harmless.

*F. Summary.* Neither defendant's complaints of prosecutorial misconduct—at least to the extent cognizable on appeal—nor his assertions of error by the trial court—either generally in failing to prevent prosecutorial misconduct or specifically in the challenged evidentiary rulings—call for reversal of his conviction.

*7. Testimony of Rebuttal Witness.* Defendant next claims that the trial court erred in permitting the prosecution to call inmate witness Hill at the rebuttal stage, asserting that he should have been called as part of the prosecution's case-in-chief and that the trial court permitted the testimony to exceed the allowed scope of rebuttal. Only the latter point need concern us. Although the prosecution had evidently contemplated calling Hill as part of its case-in-chief, defendant has made no showing that the prosecution intentionally held back the testimony to the rebuttal stage and Hill was properly called at that time as his testimony on defendant's statements to him that Teresa was not involved in the crimes countered the testimony of defendant and others in the defense case that Teresa was Ruiz's partner in the killings. (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1184 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Thompson* (1980) 27 Cal.3d 303, 331-332 [165 Cal.Rptr. 289, 611 P.2d 883].)

The scope of Hill's testimony presents something of a closer question, but on balance we are not persuaded that error is present or that error, to the extent present, was preserved for appeal. Defendant asserts that the testimony exceeded the proper scope of rebuttal because it "include[d] a material part of the case in the prosecution's possession that tend[ed] to establish the defendant's commission of the crime." (*People* v. *Carter* (1957) 48 Cal.2d 737, 753 [312 P.2d 665].) But, as the prosecution notes, those portions of Hill's testimony that went beyond a showing that Teresa was not involved in the crimes did not introduce anything new or significantly different to link defendant to the crimes; for the most part, the testimony merely reiterated and fortified the parts of the prosecution's case-in-chief that had been attacked by the defense evidence. (See *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 263 [32 Cal.Rptr. 199, 383 P.2d 783]; *People* v. *Graham* (1978) 83 Cal.App.3d 736, 741 [149 Cal.Rptr. 6].)

Hill's testimony did introduce a few new points. He was the only witness testifying that defendant admitted participating in the killing of both victims, that defendant stabbed the female victim more than once, that he stabbed her in the eye (a wound not found by the pathologist or otherwise

shown to exist), and that he planned the crimes. Contrary to the testimony of Santana and Teresa, and more explicit than the testimony of inmate witness Jones, Hill's testimony painted defendant as an active participant in the brutal murders of both victims.

■■■ The admission of rebuttal evidence rests largely within the sound discretion of the trial court and will not be disturbed on appeal in the absence of "palpable abuse." (*People* v. *Graham* (1978) 83 Cal.App.3d 736, 741 [149 Cal.Rptr. 6]; see § 1093, subd. (d).) The record in this case will not support a finding that the trial court abused its discretion in allowing the rebuttal testimony. Moreover, defense counsel's failure to object on this ground precludes the challenge on appeal in any event. (*Thompson, supra,* 27 Cal.3d at p. 332.)

*8. Admission of Jailhouse Tape Recordings.* Defendant challenges, on three separate grounds, admission of the tape recordings of his jailhouse conversations with family members and friends the day before he was arraigned. Defendant first asserts that the tapes should have been suppressed because they were obtained only as a result of the delay of his arraignment beyond the time mandated by statute, and at a time he was allegedly without the assistance of counsel. Defendant also contends, independent of these two grounds, that suppression is required as a remedy for violation of his statutory right of privacy as a pretrial detainee, asserting that retroactive application of our decision in *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142], which we rejected in *Donaldson* v. *Superior Court* (1985) 35 Cal.3d 24 [196 Cal.Rptr. 704, 672 P.2d 110], is now mandated by the rule in *Griffith* v. *Kentucky* (1987) 479 U.S. 314 [93 L.Ed.2d 649, 107 S.Ct. 708]. None of his challenges to the admissibility of the tape recordings is persuasive.

*A. Arraignment Delay.* Defendant was arrested without a warrant shortly before noon on Monday, April 12, 1982. He was not arraigned until the morning of April 15, 1982. By constitutional provision (Cal. Const., art. I, § 14) and by statute (§ 849, subd. (a)), defendant was entitled to be brought before a magistrate "without unnecessary delay." ■■■ As even an accused arrested upon a warrant previously issued by a judicial officer must be arraigned within two days (§ 825), a fortiori, the three-day delay here violated defendant's right to a prompt arraignment. (See *People* v. *Pettingill* (1980) 21 Cal.3d 231, 243 [145 Cal.Rptr. 861, 578 P.2d 108].)

■■■ Defendant analogizes the recording of his jailhouse conversations during the period of this illegal detention without arraignment to the obtaining of a confession during such a period and, on that basis, argues that the tape recordings should have been suppressed. Recognizing that even an

illegal detention does not automatically render a confession inadmissible and that a defendant must show the detention "produced the admissions" or there was "an essential connection" between the two events (*Thompson, supra,* 27 Cal.3d at pp. 329-330), defendant contends the arraignment delay denied him the prompt appointment of counsel and thus deprived him of "the standard advisement not to expect any privacy on the jailhouse visitor phones."

Defendant has shown nothing more than a "but for" relationship between his prearraignment detention and the taping. His argument would, contrary to the rule in *Thompson, supra,* 27 Cal.3d 303, render inadmissible virtually every statement obtained during the period of an illegal detention, for in each such case the defendant could argue that but for the delay, counsel would have been appointed and would have advised against the making of any statement. (See *People* v. *Cook* (1982) 135 Cal.App.3d 785, 792-793 [185 Cal.Rptr. 576].)

■ Moreover, defendant has not preserved this issue for appeal. Defendant objected to introduction of the tape recordings solely on the ground that they were obtained in violation of the right of privacy recognized in *De Lancie* v. *Superior Court, supra,* 31 Cal.3d 865. He did not raise any objection based on delay in arraignment. (See *People* v. *Wein* (1958) 50 Cal.2d 383, 411 [326 P.2d 457].) Defendant asserts that he may nonetheless raise the issue under the "capital case" exception of *People* v. *Frank* (1985) 38 Cal.3d 711 [214 Cal.Rptr. 801, 700 P.2d 415], because he did object to the admissibility of the evidence, albeit on a different ground.[24] The People counter that defendant does not fall within the terms of the exception and suggest in addition that the exception is wrong and, if not overruled, should at least not be extended beyond the facts of the case in which it was announced.

As defendant should not enjoy the benefit of the exception here, we need not reach the People's other arguments. The exception is a limited one, for we stated only that "[o]n an appeal from a judgment imposing the penalty of death, a technical insufficiency in the form of an objection will be disregarded and the entire record will be examined to determine if a miscarriage of justice resulted." (*Frank, supra,* 38 Cal.3d at p. 729, fn. 3.) In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], we declined to excuse a failure to object on the ground asserted as an issue on

---

[24] Defendant also asserts that the issue is reviewable, despite the absence of a specific objection, as a pure question of law. The cases he relies on for this proposition are inapposite, each dealing with such issues as the required elements of an offense (see, e.g., *People* v. *Jenkins* (1985) 168 Cal.App.3d 41, 46 [213 Cal.Rptr. 904]) and none touching on admissibility of evidence.

appeal although an objection had been made on other grounds. "Defendant's failure even to allude to [the new basis for the objection] . . . is distinguishable from such a 'technical insufficiency' as appears in *Frank,* where the defect in the objection was merely that it 'could have been more specific.' [Citation]." (*Id.* at pp. 1129-1130, fn. 3.) These words are equally apt here.[25] Whether on the merits or on the basis of waiver, defendant's objection to admission of the tape recordings on grounds of arraignment delay must be rejected.

B. *Delayed Appointment of Counsel.* ■ In addition to his claim that suppression of the jailhouse tape recordings was required because the delay in arraignment and appointment of counsel provided the causal link between his illegal detention and his admissions, defendant raises the failure to appoint counsel promptly as an independent issue on appeal and asserts that this violation of his right to counsel requires suppression of the tape recordings. He asserts that he was without counsel for a full two weeks after his arrest, and complains that he was prejudiced as a result of this delay because he lost "the opportunity to be advised not to expect privacy when talking to visitors on the jail telephone," as well as "the opportunity to enter a plea bargain, or otherwise cooperate with the prosecutorial authorities, before his potential co-defendants . . . had time to make their deals . . . ."

Defendant again did not preserve this issue for appeal. He could have raised the issue at his preliminary hearing, and could have asserted that the delay in appointment of counsel had prejudiced his ability to defend himself and that the information should therefore be set aside. (See, e.g., *Jennings* v. *Superior Court* (1967) 66 Cal.2d 867, 874-875 [59 Cal.Rptr. 440, 428 P.2d 304].) He did not do so and will not be heard to complain of the alleged delay for the first time on appeal. (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 45 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].)

Moreover, the record before the court does not demonstrate that defendant was in fact without counsel after his arraignment. Defendant asserts

[25] Defendant acknowledges in his reply brief that he did not raise the arraignment delay directly as a ground for challenging the admission of the tape recordings, but asserts that "defense counsel did argue that the taping was improperly done at a time when [defendant] should have had appointed counsel, but did not" and contends that such argument sufficiently raised and preserved the issue. We cannot agree. The most that appears in the argument on the suppression motion is a passing reference to the right to counsel generally. "[The prosecutor] has put on quite a bit of evidence . . . with regard to why these tapings were made. . . . I believe they were strictly [made] for gathering the evidence after a person has been charged and had a right to an attorney, a right to counsel." The argument does not even tie the recordings to the fact that defendant did not have appointed counsel at the time, much less tie it to the arraignment delay.

that: (1) the public defender initially appointed at the time of his arraignment did nothing on his behalf; (2) the public defender withdrew from representing him four days later because of the potential conflict of interest arising from the prior appointment of the office to represent Ruiz; (3) the private attorney then approached by the court to represent defendant never agreed to the appointment or performed any services for him; and (4) defendant therefore had no counsel until an attorney temporarily retained by his family appeared on his behalf. In fact, the record shows that private counsel was appointed by the court on the very day the public defender was permitted to withdraw and that he was relieved only when retained counsel appeared for defendant. No violation of the right to counsel appears on the record (*People* v. *Hathcock* (1973) 8 Cal.3d 599, 612-613 [105 Cal.Rptr. 540, 504 P.2d 476]), and suppression of the tape recordings is not warranted on this ground—even apart from the fact that defendant's claims of prejudice in this regard continue to be speculative and that he did not raise this objection at trial.

*C. Retroactivity Under Griffith v. Kentucky of De Lancie v. Superior Court.* Defendant contends alternatively that suppression of the tape recordings is required because they were obtained in violation of his statutory right of privacy as a pretrial detainee. We recognized this right in *De Lancie* v. *Superior Court, supra,* 31 Cal.3d 865, holding that the monitoring of detainees' conversations was barred by sections 2600 and 2601 to the extent that it was done "for the purpose of gathering evidence for use in criminal proceedings, rather than to maintain the security of the jail . . . ." (*Id.* at p. 877.) The recording in the present case was undertaken three months before that opinion issued, however, and in *Donaldson* v. *Superior Court, supra,* 35 Cal.3d 24, applying our customary test for determining the retroactive effect of a decision establishing a new rule of law, we held *De Lancie* inapplicable to antecedent conduct. Declining to decide whether suppression was even the appropriate remedy for a *De Lancie* violation, we found that "retroactive application of . . . [an exclusionary] sanction would serve no constructive purpose; it would not restore the privacy of those whose innocent conversations had been monitored, but would benefit only those who made incriminating admissions." (*Id.* at p. 39.)

In *Griffith* v. *Kentucky, supra,* 479 U.S. 314, the Supreme Court abandoned the historic "clear break" exception to retroactive application of a new decision. Reasoning (1) that the use of such case-specific factors as "reliance by law enforcement officials and the burden on the administration of justice" to determine retroactivity was inconsistent with the court's duty as an adjudicative, rather than a legislative, body to do justice to each litigant on the merits of his own case and thus tainted the integrity of judicial review (*id.* at pp. 322-323, 326-327 [93 L.Ed.2d at pp. 657-658, 660-

661]), and (2) that the exception countenanced inequity by treating similarly situated defendants differently (*id.* at pp. 323, 327-328 [93 L.Ed.2d at pp. 659, 661-662]), the court held "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break" with the past." (*Id.* at p. 328 [93 L.Ed.2d at p. 661].) Defendant contends that this new rule of retroactivity compels application of *De Lancie* to his case.

We are not compelled to follow *Griffith,* as it specifies only the rule of retroactivity that the Supreme Court has decreed for those new rules of criminal procedure it announces that (1) are binding on the federal courts pursuant to the Supreme Court's supervisory powers in the federal system, or (2) are binding on state and federal courts as a matter of federal constitutional law. That is, nothing in *Griffith* purports to establish a new rule of retroactivity for rules of criminal procedure founded on state constitutional or statutory law. (See also *United States* v. *Johnson* (1982) 457 U.S. 537, 542 [73 L.Ed.2d 202, 208, 102 S.Ct. 2579].) And we decline to adopt a similar rule of retroactivity for our own decisions.[26]

"Whether a judicial decision establishing new . . . standards is to be given retroactive effect is customarily determined by weighing the following factors: "(a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of retroactive application of the new standards.' [Citations.] . . . Decisions have generally been made fully retroactive only where the right vindicated is one which is essential to the integrity of the fact-finding process. On the other hand, retroactivity is not customarily required when the interest to be vindicated is one which is merely collateral to a fair determination of guilt or innocence." (*People* v. *Kaanehe* (1977) 19 Cal.3d 1, 10 [136 Cal.Rptr. 409, 559 P.2d 1028] [quoted in *Donaldson, supra,* 35 Cal.3d at p. 38].) "In search and seizure cases, the tripartite test leads generally to the conclusion that a decision should not be given retroactive effect. As explained in *Kaanehe* [*supra*], in such a case '[e]xclusion is not necessary to ensure the reliability of the fact-finding process at trial. No compulsion is present and the evidence seized is entirely trustworthy. As the purpose of the exclusionary rule in those circumstances is to deter illegal conduct by law enforcement officials, exclu-

---

[26] In light of this approach, we do not decide whether *De Lancie, supra,* 31 Cal.3d 865, should be deemed to have established "a new rule for the conduct of criminal prosecutions" within the meaning of *Griffith, supra,* 479 U.S. 314. We declined in *Donaldson, supra,* 35 Cal.3d 24, to determine whether suppression of evidence was the appropriate remedy for a violation of the statutory privacy rights of pretrial detainees and have no occasion to address the question here.

sion of evidence seized prior to the pronouncement of a decision does not further compliance with that decision.' [Citations.]" (*Donaldson, supra,* 35 Cal.3d at pp. 38-39.)

We find nothing in *Griffith, supra,* 479 U.S. 314, or in *United States* v. *Johnson, supra,* 457 U.S. 537, which presaged the adoption of the new rule, that causes us to question the soundness of our existing tripartite test. We cannot agree that considering the impact of a decision on the judicial system is an abdication of our judicial function or taints the integrity of the adjudicative process; indeed, as a former Chief Justice of this court has noted, other policy considerations, such as the need to measure the benefits of a retroactive change against the hardship that might result, counsel against a blanket rule of retroactivity. (See Traynor, *Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility* (1977) 28 Hastings L.J. 533, 540-542.) Nor are we troubled by the fact that our standard for determining retroactivity results in different treatment of similarly situated defendants. That is an unavoidable consequence of dispensing justice on a societal basis. "Inequity arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue. But we regard the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision-making." (*Stovall* v. *Denno* (1967) 388 U.S. 293, 301 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967].)

*D. Summary.* We reject defendant's challenges to admission of the jailhouse tape recordings. Although the timing of the visits allowed by jail officials suggests that the conversations were monitored for the express purpose of obtaining evidence to be used against defendant—in violation of the privacy right we subsequently recognized in *De Lancie, supra,* 31 Cal.3d 865—defendant has failed to show a connection between the arraignment delay (or the alleged delay in appointment of counsel) and his statements that would warrant suppression of his admissions, and he failed to preserve the issue even under the questioned (see *Anderson, supra,* 43 Cal.3d at pp. 1129-1130, fn. 3) "capital case" exception. His contention that retroactive application of *De Lancie* is mandated by *Griffith, supra,* 479 U.S. 314, lacks merit, and we decline to embrace that case's retroactivity analysis in place of our customary and reasonable tripartite test.

*9. Admission of Victim Photographs.* ■ Defendant contends that the trial court abused its discretion in admitting into evidence 25 of the 51 photographs of the victims and the crime scene proffered by the prosecution. The photographs objected to were enlargements of autopsy photographs, showing individual wounds much larger than life-size. Defendant

contends that these enlarged photographs—depicting wounds shown on other life-size photographs—were cumulative and that the prejudicial impact of the photographs accordingly outweighed whatever probative value they might have.

The admission of photographs of a victim lies within the discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs is clearly outweighed by their prejudicial effect. (*Phillips, supra,* 41 Cal.3d at p. 54; *People* v. *Frierson* (1979) 25 Cal.3d 142, 171 [158 Cal.Rptr. 281, 599 P.2d 587].) We see no abuse of discretion here.

If they served no other purpose, the enlarged photographs helped to clarify the testimony of the medical expert—who testified on the basis of another's notes and autopsy report, as the author had since died—on the location and nature of the wounds. (*Hathcock, supra,* 8 Cal.3d at p. 621.) Although somewhat cumulative to the life-size photographs, they were at least useful. Furthermore, as the prosecutor advanced the theory of wilful, deliberate and premeditated murder in addition to the felony-murder theory on which he mainly relied, the photographs were also relevant to establish the manner in which the killings were committed.[27] (*Ramos, supra,* 30 Cal.3d at p. 576; *Frierson, supra,* 25 Cal.3d at p. 171.) And, the photographs are not particularly gruesome. They are enlarged, rather clinical, depictions of wounds, many of them disassociated from a human body. Defendant's contention that the enlargements turned "ordinary knife wounds into gaping holes" seriously overstates the likely impact of these photographs on the jurors.

*10. Testimony of Victim's Mother.* ■ Defendant claims the trial court should not have allowed the mother of Carol Hayes to testify at the guilt phase, contending that the testimony was largely irrelevant and at best cumulative to other evidence. Citing us to *People* v. *Ramos, supra,* 30 Cal.3d 553, and *O'Meara* v. *Haiden* (1928) 204 Cal. 354 [268 P. 334, 60 A.L.R.

[27]Defendant complains that admission of the photographs cannot be sustained on this basis, because the People on two occasions conceded before the trial court that Ruiz had inflicted all but one of the wounds and that defendant was directly responsible only for a single wound on the female victim's wrist. The record reflects such statements by the People—made, however, in the context of opposing defendant's motion to augment the record with the entire transcript of the Ruiz trial and made not by the prosecutor but by the deputy attorney general responsible for the appeal after "a cursory review of the appellate record . . . ." The statements were not addressed to the point in question here, and the case was not tried under an assumption by either side that the prosecution's theory was so limited. In these circumstances, to treat the statements as "concessions" would be unreasonable. Furthermore, defendant's argument on this score is baffling, for it would extend not only to the enlarged photographs at issue but also to the life-size photographs whose admission into evidence defendant did not challenge.

1381], defendant contends that the minimal probative value of the testimony was greatly outweighed by its prejudicial impact and seems almost to contend that any testimony by a parent of a murder victim is inherently more prejudicial than probative.

Neither case is apposite. *Ramos* involved the introduction into evidence of a photograph of a murder victim while alive and the identification of the photograph by the victim's parent. Admission of the photograph was error, as the defense had offered to stipulate to the point for which the photograph was introduced. *O'Meara* addressed the same point in the context of a personal injury case. Neither decision speaks to the admission of a parent's testimony generally, and each suggests at most that the prejudicial impact of a parent's testimony may be greater than that of other witnesses. Neither decision purports to alter the probative value/prejudicial impact analysis for the admission of evidence, however.

Carol's mother testified that: (1) Carol had poor eyesight and wore glasses; (2) the last entry in the motel telephone log was in Carol's handwriting; and (3) Jack and Carol followed a set routine when working together evenings in the motel office. Together with other evidence, this testimony supported the prosecution's theory that the murders occurred between 9 and 10 p.m. because: (1) glasses were found on the floor of the motel front office; (2) the last telephone log entry was for 9:01 p.m.; and (3) under the couple's set routine, Carol would have handled the front office duties only until 10 p.m. As the time frame of the murders was critical in evaluating the movements of defendant and Ruiz that evening, the testimony was plainly relevant.

Defendant asserts, however, that the testimony was cumulative of other evidence establishing the same points. It was not. A motel maid testified that she did not remember seeing Carol wear glasses. Carol's mother knew that Carol had worn glasses since she was 15 and testified to that effect. The regional manager of the motel chain could not identify the handwriting in the telephone log, testifying that either Jack or Carol could have made the entry. Carol's mother was able to testify that the handwriting was that of her daughter. The assistant manager of the motel testified as to what he thought the couple's work habits were, but he acknowledged that he did not know their routine for a fact as they handled the front office on his nights off. Carol's mother knew the couple's routine on such occasions and could testify from personal knowledge and observation.

The testimony of Carol's mother was relevant and not cumulative, and the trial court later observed that she had been "very factual and unemotional in her testimony." Defendant has identified no prejudice, apart from

a half-hearted attempt to suggest that prejudice should be presumed from a parent's testimony, and the probative value of the testimony easily outweighed any minimal prejudice that might have arisen.[28] The trial court did not abuse its discretion in allowing the testimony. (See *People* v. *McDowell* (1988) 46 Cal.3d 551, 565 [250 Cal.Rptr. 530, 758 P.2d 1060].)

*11. Peremptory Challenges to Jurors.* ▪▪▪ In a supplemental brief, defendant objected for the first time that the prosecutor used his peremptory challenges to exclude from the jury all persons, nine in number, who expressed reservations about the death penalty; i.e., those who were not so "irrevocably committed . . . to vote against the death penalty" to permit their exclusion for cause under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522, footnote 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770]. Defendant contends that the exclusion of these prospective jurors, otherwise known as "death penalty skeptics" or "death-scrupled veniremen," combined with the prosecutor's challenges for cause under *Witherspoon* of 10 other prospective jurors, produced a jury that was conviction-prone at the guilt phase and death-prone at the penalty phase, and thus violated his Sixth Amendment right to a fair and impartial jury.[29]

We have rejected these claims on a number of occasions as to both the guilt phase and the penalty phase of a capital case (*People* v. *Chavez* (1985) 39 Cal.3d 823, 827 [218 Cal.Rptr. 49, 705 P.2d 372]; *People* v. *Turner* (1984) 37 Cal.3d 302, 313-315 [208 Cal.Rptr. 196, 690 P.2d 669]; see also *People* v. *Fields* (1983) 35 Cal.3d 329, 374 [197 Cal.Rptr. 803, 673 P.2d 680]; *Hovey, supra,* 28 Cal.3d at pp. 61-69), and have consistently declined to reconsider the issue. (See, e.g., *People* v. *Keenan* (1988) 46 Cal.3d 478, 503 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People* v. *Melton* (1988 44 Cal.3d 713, 732 [244 Cal.Rptr. 867, 750 P.2d 741].) The argument has met with no greater acceptance by the United States Supreme Court. (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 173-184 [90 L.Ed.2d 137, 147-155, 106 S.Ct. 1758].)

Despite the weight of this adverse precedent, defendant contends that the issue remains an open one under federal law and that we should reexamine

---

[28] A separate question is presented as to the testimony of Carol's mother at the penalty phase of the trial. Although the United States Supreme Court in *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] held evidence of a murder victim's character to be irrelevant to a capital sentencing decision and its admission error, the court did not alter the analysis for the admission of evidence generally or bar the testimony of a victim's relative where that testimony is more probative than prejudicial.

[29] As no objection was made to the jury selection process in the trial court, it is not clear that defendant has preserved his right of appeal on this point. The requirement that a contemporaneous motion be made to object to a prosecutor's use of peremptory challenges to exclude prospective jurors of one racial group (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 280 [148 Cal.Rptr. 890, 583 P.2d 748]) would seem applicable to the prosecution's use of peremptory challenges to exclude "death penalty skeptics" as well.

the question, asserting that in *Gray* v. *Mississippi* (1987) 481 U.S. 648 [95 L.Ed.2d 622, 107 S.Ct. 2045] the Supreme Court "criticized" this practice. We cannot find in *Gray* any such criticism or any ground for reexamination of the issue. We therefore reject this argument yet again.

*12. Cumulative Error.* Apart from asserting that each of the alleged errors raised on appeal separately warrants reversal, defendant contends that the cumulative impact of the errors—in particular on the jury's evaluation of the relative credibility of the immunized witnesses, the informant witnesses, and defendant—"constitutes an extraordinarily strong case for reversal." Despite the potential significance of the witness credibility question, as suggested by the jury's request, shortly into its deliberations, for reinstruction on the testimony of felons and accomplices, there was overwhelming evidence of defendant's guilt, and nothing in the errors alleged by defendant could have caused the jury to give more credence to defendant's version of the events. We cannot agree it is reasonably probable a result more favorable to defendant would have been reached in the absence of the alleged errors (*Watson, supra,* 46 Cal.2d at p. 836) and thus reject defendant's contention that reversal is required.

SPECIAL CIRCUMSTANCES ISSUES

Defendant challenges the jury's findings on the felony murder-robbery and multiple-murder special circumstances because no "intent to kill" instruction was given, and also contends the trial court erred in ruling that it lacked the discretion to strike both special circumstances. Neither contention has merit.

*13. Failure to Instruct on Intent to Kill.* ▮▮▮ In *People* v. *Anderson, supra,* 43 Cal.3d 1104, we held: "[I]ntent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved before the trier of fact can find the special circumstance to be true." (*Id.* at pp. 1138-1139.) We held to the same effect as to the multiple-murder special circumstance. (*Id.* at pp. 1149-1150.) Defendant asserts that the felony murder-robbery and multiple-murder special circumstances must be set aside here because the jury was not instructed it had to find defendant had the intent to kill in order to find either special circumstance to be true.

As we noted in our discussion of *Beeman* error at the guilt stage (*ante,* pp. 309-311), we have previously concluded that the special circumstance instructions adequately advise a jury of the findings that must be made under *Anderson*. (*Warren, supra,* 45 Cal.3d at pp. 487-488.) There was accordingly no error here.

*14. Refusal to Strike Special Circumstances.* On three occasions prior to the penalty phase of the trial, defendant requested the trial court to strike the special circumstance allegations because even under the prosecution's theory of the case he was allegedly less culpable than Ruiz and should not be subject to a greater penalty. On the first occasion, the trial court ruled that it could not do so; on the second occasion, the court ruled that it would not do so, unless the evidence presented did not support the allegations; and on the third occasion, applying that standard, the court did not do so. Relying on *People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029], defendant contends that the trial court erroneously refused to recognize and then to exercise its discretion to strike the special circumstance allegations from the case. In essence, what he contends is the trial court applied the wrong standard and that he was entitled to a form of intracase proportionality review before trial based on the outcome of his codefendant's case.

We have held that a trial court may, if a jury returns a penalty phase verdict imposing the punishment of life imprisonment without possibility of parole, exercise its power under section 1385 to dismiss the special circumstance findings and thus make the defendant eligible for parole. (*People* v. *Zimmerman* (1984) 36 Cal.3d 154, 159 [202 Cal.Rptr. 826, 680 P.2d 776]; *Williams, supra,* 30 Cal.3d at p. 489.) We have also held that the trial court has the authority to strike the special circumstance findings before a jury returns a verdict of death at the penalty stage of a capital case. (*People* v. *Hamilton* (1988) 45 Cal.3d 351, 376-377 [247 Cal.Rptr. 31, 753 P2d 1109].) But we have not squarely addressed the question whether this power may be exercised pretrial to preclude the prosecution from seeking the death penalty. (Cf. *Corenevsky* v. *Superior Court* (1984) 36 Cal.3d 307, 314 [204 Cal.Rptr. 165, 682 P.2d 360]; *People* v. *Superior Court* (1987) 189 Cal.App.3d 1649, 1652 [235 Cal.Rptr. 113].)

We need not resolve the question here, for the trial court ultimately considered defendant's request and denied it on its merits. Assuming that the trial court had that power, its decision was a proper exercise of discretion. Moreover, as noted, defendant's challenge is not so much a challenge to the trial court's refusal to exercise discretion it may or may not have possessed, as it is an attempt to interject intracase proportionality review in the guise of a motion to strike the special circumstance allegations. We reject this attempt.

PENALTY PHASE ISSUES

Defendant challenges the penalty phase verdict of death on some 14 separate grounds and, as at the guilt phase, also asserts that cumulative

error requires reversal. His arguments focus on improper admission of evidence, prosecutorial misconduct, and faulty jury instructions or instructions not given. Most of his arguments are foreclosed by our prior decisions, and we reject here those that are not.

*15. Notice of Aggravating Evidence.* Defendant objects that two witnesses—inmate witness Jones and the mother of Carol Hayes—were allowed to testify at the penalty phase although the prosecution had not given notice pretrial that their testimony would be presented in aggravation. Although notice was not given, we find no cognizable error as to Jones. And as to Carol's mother, we consider this question only as it relates to whether the testimony should have been allowed under any circumstances, with or without advance notice.

■■■ The prosecution has a statutory duty to provide the defense with advance notice of the evidence it proposes to introduce in aggravation of the offense. "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation." (§ 190.3.)

The prosecution failed to meet its obligations in this case. As to inmate witness Jones, however, the error is not cognizable on appeal as no objection on this ground was made. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 108 & fn. 30 [241 Cal.Rptr. 594, 744 P.2d 1127].) Defense counsel's objection to the testimony as cumulative was not sufficient to preserve the issue for appeal. (Cf. *Anderson, supra,* 43 Cal.3d at pp. 1129-1130, fn. 3.) Moreover, any error on this score was harmless. The purpose of the notice requirement is to afford a capital defendant the opportunity to prepare to meet evidence introduced in aggravation of the offense. (*People* v. *Caro* (1988) 46 Cal.3d 1035, 1059 [251 Cal.Rptr. 757, 761 P.2d 680]; see *Miranda, supra,* 44 Cal.3d at p. 96.) In the absence of any indication that the delay in notice had in some fashion affected the manner in which defense counsel handled the prior proceedings, the appropriate remedy for a violation would ordinarily be to grant a continuance as needed to allow defendant to develop a response. (See *People* v. *Howard* (1988) 44 Cal.3d 375, 419-425 [243 Cal.Rptr. 842, 749 P.2d 279]; *People* v. *Reyes* (1974) 12 Cal.3d 486, 502 [116 Cal.Rptr. 217, 526 P.2d 225].)

Here, Jones testified as to an alleged threat made by defendant within Jones's hearing that Jones would be "a dead man" when he got to prison

because he had testified against defendant at the guilt phase. Defendant countered this testimony with: (1) the testimony of the three inmates to whom defendant had allegedly communicated the threat, each of whom denied having a conversation with defendant on the day the threat was allegedly made and denied being told such a threat or passing it on to Jones; (2) the testimony of a deputy sheriff that defendant had been transferred to a different cell block from that of Jones after the guilt phase, although the computer records had not been changed promptly and it was possible that defendant had been returned to the same cell block upon his return from court; and (3) defendant's own testimony that he had been returned to a different cell block from Jones after the guilt phase of the trial and thus could not have made, and did not make, the threat. Defendant was fully able to meet this aggravating evidence and was therefore not prejudiced by the failure to give advance notice of Jones's testimony.[30]

As to the testimony of Carol's mother, objection was made for the failure to give advance notice, and the issue is properly before us. The People now assert that her testimony was proper under the statutory authorization for "evidence in proof of the offense" to be admitted without advance notice. Not so. Only one small portion of her testimony—that the couple wore glasses—could be deemed within the statutory exception, and she had previously testified to that fact at the guilt phase. Even were the penalty phase testimony on that point not objectionable as repetitive, it could not support the remainder of her testimony. Indeed, the People seem to concede as much, for their argument inconsistently posits in the same breath that the other portions of the testimony—that the couple kept no guns, had been instructed to give robbers whatever they wanted and would do anything to avoid a violent confrontation—established that the victims were not participants in the homicidal conduct, a point that goes only to penalty and has nothing to do with proof of the underlying offense.

That the failure to give advance notice of the testimony was error, however, does not establish that it was prejudicial on that ground. As the testimony was extremely brief, and as defendant did not contend that the victims had participated in or induced the conduct that led to their deaths, he can hardly claim to have been hampered in presenting his case in mitigation by lack of knowledge that Carol's mother would testify.

[30] Defendant also asserts that the statute bars the use as aggravating evidence of statements made, as here, after the trial has commenced and that Jones's testimony was inadmissible on that score. We rejected this argument in *People* v. *Caro, supra,* 46 Cal.3d at page 1059, and decline to revisit the question. Indeed, where evidence showing a propensity for violence is not even available until after trial has commenced, it would be absurd to exclude it on the ground that notice "prior to trial" was not given and we cannot accept the proposition that the jury was not entitled to learn of a threat allegedly made by defendant against a witness in the very case they were considering.

*16. Testimony of Victim's Mother.* In *Booth* v. *Maryland, supra,* 482 U.S. 496, the United States Supreme Court ruled a state statute invalid, as violating the Eighth Amendment, to the extent that it required consideration of a victim-impact statement at the sentencing phase of a capital case. The statement provided the jury with information on the personal characteristics of a victim, the emotional impact of the crime on the victim's family, and family members' opinions and characterizations of the crime and the defendant—information that the Supreme Court found was "irrelevant to a capital sentencing decision" and whose admission "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." (*Id.* at pp. 502-503 [96 L.Ed.2d at p. 448, 107 S.Ct. at p. 2533].) Defendant relies heavily on *Booth* to argue that the testimony of Carol's mother was improperly admitted at the penalty phase.

*Booth* does not purport to bar generally the use of information about a murder victim at the penalty phase. The Supreme Court's concern lay mainly in the mandatory requirement that the entire victim-impact statement be admitted and in the risk that the jury's attention would be drawn to the personal qualities of the victim rather than to the blameworthiness of the defendant. Although the court "reject[ed] the contention that . . . the victim's personal characteristics . . . are proper sentencing considerations in a capital case" (482 U.S. at p. 507 [96 L.Ed.2d at p. 451, 107 S.Ct. at p. 2535]), the court took pains to note that "[s]imilar types of information may well be admissible because they relate directly to the circumstances of the crime" and that "there may be times that the victim's personal characteristics are relevant to rebut an argument offered by the defendant." (*Id.* at p. 507, fn. 10 [96 L.Ed.2d at p. 451, 107 S.Ct. at p. 2535].) *Booth* thus does not alter the standard for the admission of such evidence. (See also *South Carolina* v. *Gathers* (1989) 490 U.S. __ [104 L.Ed.2d 876, 109 S.Ct. 2207].) The question thus remains whether the testimony was relevant, and whether its probative value outweighed any prejudicial effect.

The victim's mother testified at the penalty phase that her deceased daughter and son-in-law had poor eyesight, wore glasses, kept no guns, and avoided violent confrontations. Such evidence was relevant and admissible in the prosecution's case-in-aggravation as "relat[ing] to the circumstances of the crime." (*Booth, supra,* 482 U.S. at p. 507, fn. 10 [96 L.Ed.2d at p. 451, 107 S.Ct. at p. 2535]; see Pen. Code, § 190.3, factor (a).) The victims had been robbed and stabbed to death; Carol Hayes had been stabbed 20 to 30 times, and Jack Hayes had 14 or 15 large stab wounds, including one to the head where a knife had broken off at the surface of the skull, leaving a 3-inch portion of the blade embedded inside. The mother's testimony circumstantially supported an inference that the victims in all likelihood did not

resist the robbery and the violent, fatal attack. This in turn bore directly upon the *manner* in which defendant committed the murders, and was plainly a "circumstance of the crime" to which fair comment could be directed.

The mother did *not* present a "victim-impact statement," nor did she discuss personal characteristics of the victims' family members, touch upon the emotional impact of the crime on the victims' families, or relate family members' opinions of the crime or the defendant. (*Booth, supra,* 482 U.S. at pp. 503-504 [96 L.Ed.2d at pp. 448-449, 107 S.Ct. at p. 2533].) Her testimony, probative as tending to support an inference that this brutal robbery-double murder was executed in all likelihood without any resistance from the victims, was properly presented for the jury to weigh in determining the appropriate penalty.

*17. Prosecutorial Misconduct.* As he did in his guilt phase arguments, defendant again contends that the prosecutor committed numerous instances of misconduct during the proceedings and argument at the penalty phase. There is nothing here to warrant reversal.

Defendant first complains of the prosecutor's continued reliance on the "tainted" testimony of Santana to oppose defendant's motion to strike the special circumstances and to argue to the jury, among other points, that defendant was the person who had gone into the motel kitchen to find another knife after the one Ruiz was using broke off in Jack Hayes's head. But there was no error in the trial court's denial of the motion to strike and thus no conceivable prejudice from any misconduct in that context, and the prosecutor's allegedly inconsistent arguments in the separate trials of defendant and Ruiz could be considered only on habeas corpus.[31] (See *ante,* p. 317, fn. 18.)

Defendant next complains of the prosecutor's eliciting of testimony from Carol's mother on the victims' good character. But the trial court had allowed the testimony of Carol's mother, and we have previously determined that the error in that ruling was not prejudicial. No misconduct is shown by the eliciting of testimony after defense objections were overruled.

Defendant also charges the prosecutor with misconduct for having asked during cross-examination of defendant's mother whether defendant had ever been arrested for drunk driving. The question was improper, as no evidence was or could have been introduced on the point, but no objection

---

[31] Defendant's claim on this point was raised and rejected in his petition for writ of habeas corpus. (*Ante,* p. 317, fn. 18.)

was made to the question (see *Miranda, supra,* 44 Cal.3d at p. 108) and even were we to consider the claim despite that failure, we fail to see how any prejudice could be shown in view of the fact that defendant's mother testified he had not been arrested on such a charge and, indeed, had never had any problems with the police.

Defendant also objects to a number of allegedly inflammatory comments made by the prosecutor during closing argument. The prosecutor: (1) asserted that Carol Hayes was "literally tortured" by the number of stab wounds inflicted on her body; (2) asked the jurors to "think of the sheer pain and terror the victims experienced after being struck again and again by different knives in different parts of their bodies" and opined that they "must have died a horrible death" as a result; (3) implied that defendant and Ruiz had killed the couple "just to torture" or to eliminate them as witnesses to the robbery; (4) argued that defendant had threatened Teresa's brother; and (5) asserted that the two inmate witnesses against defendant had been attacked because of their testimony. No objections were made at trial to any of the comments defendant now claims constituted misconduct, and we will not consider them on appeal as a timely objection and admonition could have cured any harm. (*Brown, supra,* 46 Cal.3d at p. 456.) Even were we to examine them, we would find no prejudicial error. Given the number of wounds inflicted on the victims, the prosecutor's reference to the terror probably experienced by the victims was a fair characterization of the evidence. And his arguments as to torture and threats against witnesses, although overstated, for example, to the extent he attributed to defendant attacks that the witnesses themselves had not, were not so divorced from the testimony at trial as to make the implications drawn by the prosecutor plainly unwarranted.

Finally, defendant complains that the prosecutor improperly urged the jury to consider nonstatutory aggravating factors in reaching its verdict. He contends that the prosecutor: (1) referred to defendant's prior escape from custody and noted there was "no guarantee" he might not do so again; (2) argued that defendant's drug use and the fact that he had "not spent his life in a productive manner" were points the jury should consider; (3) referred to defendant's lack of remorse; and (4) argued that the lack of evidence on three of the statutory mitigating factors, mental or emotional disturbance, victim participation and duress, made them factors in aggravation. As to all but the argument on lack of remorse, no objection was made. The objection on that point was overruled by the trial court, and the prosecutor's brief continuation of his argument cannot constitute misconduct whether or not the court's ruling, which we will turn to next, was correct. The other points

need not be considered in view of the lack of objection. (*Miranda, supra,* 44 Cal.3d at p. 108.)[32]

*18. Comment on Defendant's Lack of Remorse.* ▉ Defendant contends the trial court erred in permitting the prosecutor to comment on defendant's lack of sorrow or remorse. Under our prior cases, neither the trial court's ruling nor the prosecutor's argument was error. The prosecutor did not commit the act we condemned in *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248], of urging that "defendant's failure to confess his guilt after he . . . [was] found guilty demonstrate[d] his lack of remorse . . . ." The prosecutor argued only that there was "a total lack of sorrow or remorse by the defendant after the commission of this crime" and that "he didn't express sorrow for the victims." A defendant's remorse or lack thereof is a proper subject for the jury's consideration at the penalty phase (*ibid.*), and the prosecutor's comment thereon, which lacked any suggestion that the absence of remorse should be deemed a factor in aggravation of the offense, was proper. (*Miranda, supra,* 44 Cal.3d at p. 112; see also *People* v. *Walker* (1988) 47 Cal.3d 605, 649-650 [253 Cal.Rptr. 863, 765 P.2d 70].)

Moreover, remorse, as we have noted on previous occasions, is universally deemed to be relevant at the penalty stage of a capital case, and it is likely the jury would have considered this factor in the course of exercising its broad sentencing discretion whether or not the prosecutor noted the point. (See *Keenan, supra,* 46 Cal.3d at p. 510.) As the jury was not misled about the pertinent evidence or its sentencing responsibilities (see discussion, *post,* pp. 344-345), we see no reasonable possibility that the prosecutor's brief comment could have affected the jury's decision. (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 583 [247 Cal.Rptr. 729, 754 P.2d 1306].)

*19. Evidence of Nonviolent Escape Attempt.* At the guilt phase, evidence was admitted of defendant's escape from jail while in custody in this case and, as discussed previously, the jury was properly instructed on flight as showing consciousness of guilt. At the penalty phase, the jury was given the

---

[32] Even closer examination suggests objectionable misconduct in only one respect. The prosecutor's reference to defendant's past nonviolent escape attempt and his suggestion that defendant might escape in the future strike us as not entirely proper (cf. *People* v. *Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782]), but the comments were brief and arguably related to defendant's future dangerousness. (See *Dyer, supra,* 45 Cal.3d at p. 81; *Miranda, supra,* 44 Cal.3d at pp. 110-111.) Defendant's drug use and unproductive life were brought up only to argue that his young age, indisputably a mitigating factor, was entitled to little weight. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 788-789 [230 Cal.Rptr. 667, 726 P.2d 113].) And the prosecutor did not argue that the absence of evidence on mitigating factors made them factors in aggravation; he argued only and properly that the mitigating factors were not present in this case. The argument was permissible. (*Id.* at pp. 789-790.)

standard instructions to consider the evidence previously presented and the instructions previously given. ▮▮▮ Relying on our ruling that evidence of a nonviolent escape attempt is not admissible at the penalty phase (*Boyd, supra,* 38 Cal.3d at p. 776), defendant contends reversal is required because these instructions permitted and "in effect" instructed the jury to rely upon evidence of the nonviolent escape attempt as an aggravating factor in reaching its penalty verdict.

We rejected a substantially similar argument in *People* v. *McLain* (1988) 46 Cal.3d 97, 113 [249 Cal.Rptr. 630, 757 P.2d 569], and our reasoning there holds true here as well. Moreover, defendant takes far too negative a view of the likely effect of the instructions here. Taken in context and as a whole, they provided a correct statement of the law.

The jurors were instructed to consider all the evidence previously presented, "except as you may hereafter be instructed." They were told that those instructions previously given, with the exception of the antisympathy instruction, "which you find to be applicable to this part of the trial should be considered by you in reaching a decision as to the penalty to be imposed." And the jury was also advised—in the course of an instruction that it could not rely on evidence introduced to show defendant had committed the additional crimes of battery and threatening a witness unless it found beyond a reasonable doubt that defendant committed those crimes—that "[y]ou may not consider any evidence of any other criminal acts or activity as an aggravating circumstance."

These instructions, viewed in their entirety, effectively instructed the jury not to consider the escape evidence. The instruction to consider all evidence admitted at the guilt phase was limited by the directive to follow specific instructions given at the penalty phase in the event of conflict. The flight instruction given at the guilt phase could not have been "[found] to be applicable to this [penalty] part of the trial" as defendant's guilt was no longer in issue. And the jury was specifically told that the only evidence of other criminal activity it could consider was that relating to the charges of battery and threatening a witness. (See *People* v. *Robertson* (1982) 33 Cal.3d 21, 55, fn. 19 [188 Cal.Rptr. 77, 655 P.2d 279].) In these circumstances, defendant's claim that the jury was instructed to consider the escape attempt as an aggravating factor is too speculative to be accepted. (Cf. *Miranda, supra,* 44 Cal.3d at p. 102 & fn. 25.)

*20. Jury Instructions.* Defendant challenges certain of the instructions given at the penalty phase and also alleges error in the trial court's failure to give other instructions although no request was made. There is no merit to any of his contentions.

*A. Adequacy of Instructions on Other Crime.* The prosecution at the penalty phase introduced evidence that inmate witness Jones overheard defendant tell three other inmates at the county jail that Jones "was a dead man" when he got to prison because of his testimony against defendant and that defendant was going to kill him. We have previously found no merit to defendant's contention that this evidence should have been excluded for the failure of the prosecution to provide advance notice under section 190.3. Defendant here contends that the evidence was insufficient to permit the jury to consider the crime of threatening a witness as an aggravating circumstance in the case and that the trial court erroneously instructed the jury that the crime was one of general intent. Neither contention has merit.

Former section 152, subsequently renumbered as section 140 and amended in minor respects, provided: "Every person who willfully threatens to use force or violence upon the person of a witness to a crime or a victim of a crime or any other person, or to damage or destroy any property of any witness, victim, or any other person, because the witness, victim or other person has provided any assistance or information to a law enforcement officer, or to a public prosecutor in a criminal proceeding or juvenile court proceeding, is guilty of a misdemeanor." The jury was accordingly instructed that "[e]very person who willfully threatens to use force or violence upon the person of a witness to a crime or any other person, because the witness, or other person has provided any assistance or information to a law enforcement officer, or to a public prosecutor in a criminal proceeding, is guilty of a crime."

Defendant first objects that the evidence was insufficient because it did not demonstrate that he had communicated his threat to Jones, and he therefore contends that the trial court erred in permitting the jury to consider the charge because the jury could not have found "the essential elements of the crime beyond a reasonable doubt." (*Boyd, supra,* 38 Cal.3d at p. 778, internal quotation marks omitted; see *Phillips, supra,* 41 Cal.3d at p. 72.) Defendant raised no objection to the sufficiency of the evidence, however (see *Boyd, supra,* 38 Cal.3d at pp. 777-778), and thus offered the trial court no occasion to consider in a hearing outside the presence of the jury whether there was sufficient evidence to prove each element of the offense. (See *Phillips, supra,* 41 Cal.3d at pp. 72, fn. 25.) Even if the contention is properly before us on appeal, Jones testified not only that he overheard defendant making the threat, but also that the persons to whom defendant allegedly made the threat then relayed the threat to him. There was sufficient evidence to permit the jury to consider whether defendant, acting through the other inmates, threatened Jones within the meaning of the statute.

Defendant next asserts the trial court erroneously advised the jury that only general intent was required to commit the crime of threatening a

witness, contending that the court should instead have instructed the jury sua sponte that specific intent was required. We cannot agree. The trial court is under no obligation to instruct the jury sua sponte on the elements of other offenses presented as uncharged criminal activity (*Phillips, supra,* 41 Cal.3d at p. 72, fn. 25); nor is it obliged to instruct sua sponte on the degree of intent required of such an offense, provided only that the instructions it does give do not mislead the jury. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 48-49 [252 Cal.Rptr. 525, 762 P.2d 1249].) The instructions here were adequate.

 Defendant raises one final challenge to the instruction based on former section 152, asserting that it violated his constitutional right to freedom of speech in that it failed to advise the jury "that speech may constitute a crime only if there is 'clear and present danger' that such speech will lead to illegal activity. [Citations.]" The People's response to this argument strikes us as quite apt. "While the first ten amendments to the United States Constitution have been very liberally construed . . .[,] they have not yet been extended so far as to hold as a protected form of speech [defendant's] threat to Julius Jones that [defendant] would kill Jones . . . . [¶] [Defendant's] threat to kill Jones, which he had communicated to Jones, under the factual setting, clearly cannot be equated to the mere political hyperbole protected under the First Amendment. (See *Watts* v. *United States* (1969) 394 U.S. 705 [22 L.Ed.2d 664, 89 S.Ct. 1399].)" We agree.

*B. Failure to Give Unanimity Instruction.* In addition to the crime of threatening a witness, evidence was presented that defendant had committed or instigated battery upon Teresa's brother and the two inmate witnesses, and the jury was properly instructed under *Robertson, supra,* 33 Cal.3d at pages 53-55, that it could consider that evidence in aggravation of the offense only if the crime was proved beyond a reasonable doubt. Defendant contends that the trial court erred in failing to instruct the jury sua sponte that it was required to agree unanimously on at least one specific instance of battery upon at least one specific victim before the evidence could be considered.

 Our prior cases demonstrate that there is no requirement the trial court sua sponte instruct the jury on the elements of other offenses presented as uncharged criminal activity relevant to its penalty determination (*Phillips, supra,* 41 Cal.3d at p. 72, fn. 25); nor need the trial court sua sponte instruct the jury that its finding on uncharged criminal activity must be unanimous. (*Ghent, supra,* 43 Cal.3d at p. 773.) "[W]e see nothing improper in permitting each juror individually to decide whether uncharged criminal activity has been proven beyond a reasonable doubt and, if so,

what weight that activity should be given in deciding the penalty." (*Id.* at p. 774.)

*C. Instruction on Codefendant Culpability.* In considering defendant's challenges to the guilt phase verdicts, we rejected his contention that he was prejudiced because the jury was instructed under CALJIC No. 2.11.5 not to consider whether other persons had been or would be prosecuted for the crimes. Defendant now contends that this instruction was incorporated into the penalty phase by the standard instruction given the jurors to consider those guilt phase instructions "which you find to be applicable to this part of the trial . . . ." He claims prejudice as a result, asserting that the instruction: (1) impermissibly precluded the jury from evaluating the relative culpability of Ruiz and defendant in reaching its decision on penalty; and (2) precluded counsel from advising the jury of Ruiz's sentence and arguing that defendant, as the less culpable of the two, should receive mercy.

Defendant's argument piles speculation upon speculation and must be rejected. The testimony at trial fully informed the jury of the relative culpability of Ruiz and defendant, and there is no indication that counsel was precluded from arguing that defendant played a minor role in the crimes. She did so, in point of fact. The jury's verdict indicates that it did not agree. This does not constitute error. ▮ Nor is there any error in the fact that the jury was not advised of Ruiz's sentence. The punishment meted out to a codefendant is irrelevant to the decision the jury must make at the penalty phase: whether the defendant before it should be sentenced to death. (*People v. Brown* (1985) 40 Cal.3d 512, 541-542 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California v. Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) In *People v. Belmontes* (1988) 45 Cal.3d 744, 811-813 [248 Cal.Rptr. 126, 755 P.2d 310], we found no error in a trial court's ruling barring evidence of the disposition of a codefendant's case. We can see no error in the less explicit—and more speculative—restrictions placed on the jury's deliberations here.

*D. Failure to Strike Irrelevant Factors.* Defendant next complains of the trial court's failure to delete from the list of aggravating and mitigating factors read to the jury those mitigating factors on which no evidence had been presented, and also asserts that the prosecutor improperly argued that the absence of evidence on those mitigating factors made them factors in aggravation. We rejected the first prong of this argument in *People v. Ghent, supra,* 43 Cal.3d at pages 776-777 (1977 death penalty law), and *People v. Miranda, supra,* 44 Cal.3d at pages 104-105 (1978 death penalty law), and the second prong finds no support in the record. The prosecutor did not commit the error we noted in *People v. Davenport, supra,* 41 Cal.3d at pages 288-290; he properly argued only that the absence of evidence on four of the

mitigating factors made them inapplicable and defendant less deserving of leniency. (*Rodriguez, supra,* 42 Cal.3d at p. 789.)

*E. Jury's Sentencing Function.* Finally, defendant challenges the penalty phase instructions on the ground that they did not adequately advise the jury of its discretion and the factors it could consider. Defendant's argument on this point is extremely sketchy, and we are hard pressed to determine if he is arguing prejudice from the failure to instruct the jury on the extent to which they could consider "any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death' " (*People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813]), or if he is complaining of the fact that the jurors were instructed in the former mandatory language of CALJIC No. 8.84.2 that "[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death"—or both. The People's response is no more helpful.

We have examined "the totality of the penalty instructions given and the arguments made to the jury" (*Davenport, supra,* 41 Cal.3d at p. 286) to determine whether the jury was "misled to defendant's prejudice about the scope of its sentencing discretion . . . ." (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) We are persuaded that it was not.

The jurors were instructed in the former language of CALJIC No. 8.84.1 that they could consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Although they were not given the "expanded" instruction on section 190.3, factor (k) recommended by *People* v. *Easley, supra,* 34 Cal.3d 858, they were specifically instructed that they could "consider sympathy or pity for a defendant or his family as a circumstance in mitigation" as well as "[t]he defendant's character, background, [and] mental condition or physical condition." The prosecutor did not attempt to argue that sympathy or evidence of defendant's background were irrelevant factors, and we are not persuaded by defendant's argument that the jury consideration of this evidence was affected by the trial court's limiting definition of "extenuates" as that which "lessen[s] or tr[ies] to lessen the real or apparent seriousness of a crime or extent of guilt by making partial excuses or by affording a basis for excuses." (See *Keenan, supra,* 46 Cal.3d at p. 515.)

The question whether the jury fully understood the scope of its sentencing discretion may be closer, but again we find no reversible error. Although the jury was instructed in the standard "mandatory" language of former CALJIC No. 8.84.2, both the prosecutor and defense counsel took pains to advise the jury that its weighing of factors was a qualitative rather than a

quantitative or mechanical function; although neither made any comments that expressly advised the jury of its discretion to determine whether death was the appropriate penalty for this defendant, neither did they suggest the jury lacked that discretion. The prosecutor on but two occasions used the "shall" language of the instruction in the context of reminding the jurors of their promises to follow the law, and spent most of his time arguing that the aggravating factors were paramount in the case. And defense counsel's stress on the jury's unfettered discretion to determine how much weight to give each mitigating factor undoubtedly helped to advise the jury of its proper role.[33] Viewing the record as a whole, we do not think it reasonably possible that defendant was prejudiced.

*21. Cumulative Error.* Defendant concludes his challenges to the penalty phase proceedings with a brief argument that this was a close case—the jury deliberating for slightly more than a day and a half—and that the cumulative effect of numerous errors mandates reversal of the death sentence. ▉ We have seen little that constitutes error, and that little was not prejudicial under the standard of review for state law error at the penalty phase: that it be reasonably possible the jury would have rendered a different verdict had the error not occurred. (*Brown, supra,* 46 Cal.3d at p. 448.)

*22. Denial of Motion to Modify Sentence.* Under section 190.4, subdivision (e), the defendant in a capital case "in which the trier of fact has returned a verdict or finding imposing the death penalty . . . shall be deemed to have made an application for modification of such verdict or finding . . . . In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." As his penultimate assignment of error, defendant objects to the trial court's denial of his motion.

Defendant first asserts that the court erred in relying on his threat to inmate witness Jones. The argument here is no different than defendant's earlier challenge to the jury's consideration of that evidence, and it fails for the same reason. Defendant next objects to the court's failure to consider

---

[33] Defense counsel argued, for example, that "[t]he law states you and only you are the ones to assign the weight to each and every one of the factors that are to be used in determining your decision on the penalty" and that "you, ladies and gentlemen, each and every one of you individually are the ones to put the weight on each one of these factors when you take them into consideration with all the evidence."

the lesser sentence imposed on Ruiz as a nonstatutory mitigating factor. Again, as there was no error in the failure to advise the jury of the sentence received by Ruiz and as proportionality review is not mandated, a point we shall turn to in a moment, there was no error in the trial court's failure to take Ruiz's sentence into account. Finally, defendant objects that the trial court did not consider two letters from family friends. As the letters were proffered to the court only at the time of the hearing on the motion, we cannot find error in the court's ruling. Moreover, the letters, speaking generally to defendant's good nature and helpfulness, added little to the mitigating evidence which was previously before the jury and which was considered by the trial court. There was no error in the court's denial of the motion.

*23. Proportionality Review.* As his final argument, defendant asserts that his death sentence is disproportionate as compared both to his codefendant Ruiz and to other convicted murderers in the state. (See *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].) We have consistently rejected the contention that intercase proportionality review is required (*Rodriguez, supra,* 42 Cal.3d at pp. 777-779; *People* v. *Jackson* (1980) 28 Cal.3d 264, 317 [168 Cal.Rptr. 603, 618 P.2d 149]; *Frierson, supra,* 25 Cal.3d at p. 181), and we see no reason to depart from those holdings here. ▮ And as far as defendant's individual culpability is concerned, we see nothing constitutionally disproportionate in the fact that defendant received the death sentence although his codefendant, who solely because of his age was not subject to the special circumstance allegations or death penalty, did not. (Cf. *McLain, supra,* 46 Cal.3d at p. 121.) There is nothing in this death sentence disproportionate in any sense to the culpability of a defendant found guilty of the deaths of two victims from multiple stab wounds in the course of a robbery.

## CONCLUSION

We reject defendant's challenges to the guilty verdict and judgment of death. The judgment is affirmed in its entirety.

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I concur in the judgment and in general with the rationale of the majority.

It is true that cases hold intercase proportionality review is not required, i.e., *an analysis to determine whether imposition of the death penalty in this*

case was disproportionate to the penalties imposed on other persons who have committed similar offenses. (*Pulley* v. *Harris* (1984) 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 40-41, 104 S.Ct. 871].)

It is equally clear that our state constitutional proscription against cruel or unusual punishment (Cal. Const., art. I, § 17) requires a determination whether the punishment in this case is proportionate to the defendant's individual culpability. However, to do so may require a comparison of defendant's conduct with that of others involved in the same venture, i.e., intracase proportionality. We conducted that type of analysis in *People* v. *Dillon* (1983) 34 Cal.3d 441, 488 [194 Cal.Rptr. 390, 668 P.2d 697]: "In short, defendant received the heaviest penalty provided by law while those jointly responsible with him received the lightest . . . ." As a result the judgment in *Dillon* was modified. (See also *In re Wells* (1975) 46 Cal.App.3d 592, 599 [121 Cal.Rptr. 23].)

I also recently urged intracase proportionality review in *People* v. *Adcox* (1988) 47 Cal.3d 207, 276-277 [253 Cal.Rptr. 55, 763 P.2d 906]. There three persons, in my view equally responsible for the death of the victim, received widely disparate sentences.

It is my belief that a trial judge, in fulfilling his duties under Penal Code section 190.4, subdivision (e), should undertake to determine intracase proportionality as one of the necessary considerations. I do not suggest there would be a different result in this case. Indeed it is unlikely, although the codefendant, also convicted of first degree murder, was sentenced not to death but to two consecutive terms of twenty-five years to life. (*People* v. *Gonzales* (1986) 186 Cal.App.3d 591 [230 Cal.Rptr. 732].) However, we should urge trial judges to recognize the need for intracase proportionality and to make clear on the record that they have given it appropriate consideration.

Appellant's petition for a rehearing was denied November 21, 1989, and the opinion was modified to read as printed above.